RICE *v.* CAYETANO, GOVERNOR OF HAWAII

No. 98–818.   Argued October 6, 1999—Decided February 23, 2000

KENNEDY, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and O'CONNOR, SCALIA, and THOMAS, JJ., joined. BREYER, J., filed an opinion concurring in the result, in which SOUTER, J., joined, *post*, p. 524. STEVENS, J., filed a dissenting opinion, in which GINSBURG, J., joined as to Part II, *post*, p. 527. GINSBURG, J., filed a dissenting opinion, *post*, p. 547.

*Theodore B. Olson* argued the cause for petitioner. With him on the briefs were *Douglas R. Cox* and *Thomas G. Hungar.*

*John G. Roberts, Jr.,* argued the cause for respondent. With him on the brief were *Earl I. Anzai,* Attorney General of Hawaii, *Girard D. Lau, Dorothy Sellers,* and *Charleen M. Aina,* Deputy Attorneys General, and *Gregory G. Garre.*

*Deputy Solicitor General Kneedler* argued the cause for the United States as *amicus curiae* urging affirmance. With him on the brief were *Solicitor General Waxman, Assistant Attorney General Schiffer, Deputy Solicitor General Underwood, Irving L. Gornstein,* and *Elizabeth Ann Peterson.*\*

JUSTICE KENNEDY delivered the opinion of the Court.

A citizen of Hawaii comes before us claiming that an explicit, race-based voting qualification has barred him from voting in a statewide election. The Fifteenth Amendment to the Constitution of the United States, binding on the National Government, the States, and their political subdivisions, controls the case.

The Hawaiian Constitution limits the right to vote for nine trustees chosen in a statewide election. The trustees com-

---

\*Briefs of *amici curiae* urging reversal were filed for the Campaign for a Color-Blind America et al. by *Richard K. Willard* and *Shannen W. Coffin;* and for the Center for Equal Opportunity et al. by *Brett M. Kavanaugh, Robert H. Bork,* and *Roger Clegg.*

Briefs of *amici curiae* urging affirmance were filed for the State of California et al. by *Bill Lockyer,* Attorney General of California, and *Thomas F. Gede,* Special Assistant Attorney General, and by the Attorneys General for their respective jurisdictions as follows: *Bill Pryor* of Alabama, *John F. Tarantino* of Guam, *Frankie Sue Del Papa* of Nevada, *Patricia A. Madrid* of New Mexico, *Maya B. Kara* of the Northern Mariana Islands, *W. A. Drew Edmondson* of Oklahoma, and *Hardy Myers* of Oregon; for the Alaska Federation of Natives et al. by *Jeffrey L. Bleich;* for the Kamehameha Schools Bishop Estate Trust by *Carter G. Phillips, Virginia A. Seitz,* and *C. Michael Hare;* for the National Congress of American Indians by *Kim Jerome Gottschalk* and *Steven C. Moore;* for the State Council of Hawaiian Homestead Associations et al. by *Paul Alston, William M. Tam, Lea Hong,* and *David M. Forman;* and for the Office of Hawaiian Affairs et al. by *Harry R. Sachse, Reid Peyton Chambers, Arthur Lazarus, Jr., Sherry P. Broder,* and *Jon M. Van Dyke.*

Briefs of *amici curiae* were filed for the Hawai'i Congressional Delegations by *Patricia M. Zell, Jennifer M. L. Chock,* and *Janet Erickson;* for the Hou Hawaiians et al. by *Walter R. Schoettle;* and for the Pacific Legal Foundation by *John H. Findley* and *Sharon L. Browne.*

pose the governing authority of a state agency known as the Office of Hawaiian Affairs, or OHA. Haw. Const., Art. XII, § 5. The agency administers programs designed for the benefit of two subclasses of the Hawaiian citizenry. The smaller class comprises those designated as "native Hawaiians," defined by statute, with certain supplementary language later set out in full, as descendants of not less than one-half part of the races inhabiting the Hawaiian Islands prior to 1778. Haw. Rev. Stat. § 10-2 (1993). The second, larger class of persons benefited by OHA programs is "Hawaiians," defined to be, with refinements contained in the statute we later quote, those persons who are descendants of people inhabiting the Hawaiian Islands in 1778. *Ibid.* The right to vote for trustees is limited to "Hawaiians," the second, larger class of persons, which of course includes the smaller class of "native Hawaiians." Haw. Const., Art. XII, § 5.

Petitioner Rice, a citizen of Hawaii and thus himself a Hawaiian in a well-accepted sense of the term, does not have the requisite ancestry even for the larger class. He is not, then, a "Hawaiian" in terms of the statute; so he may not vote in the trustee election. The issue presented by this case is whether Rice may be so barred. Rejecting the State's arguments that the classification in question is not racial or that, if it is, it is nevertheless valid for other reasons, we hold Hawaii's denial of petitioner's right to vote to be a clear violation of the Fifteenth Amendment.

I

When Congress and the State of Hawaii enacted the laws we are about to discuss and review, they made their own assessments of the events which intertwine Hawaii's history with the history of America itself. We will begin with a very brief account of that historical background. Historians and other scholars who write of Hawaii will have a different purpose and more latitude than do we. They may draw judgments either more laudatory or more harsh than the

ones to which we refer. Our more limited role, in the posture of this particular case, is to recount events as understood by the lawmakers, thus ensuring that we accord proper appreciation to their purposes in adopting the policies and laws at issue. The litigants seem to agree that two works in particular are appropriate for our consideration, and we rely in part on those sources. See L. Fuchs, Hawaii Pono: An Ethnic and Political History (1961) (hereinafter Fuchs); 1–3 R. Kuykendall, The Hawaiian Kingdom (1938); (1953); (1967) (hereinafter Kuykendall).

The origins of the first Hawaiian people and the date they reached the islands are not established with certainty, but the usual assumption is that they were Polynesians who voyaged from Tahiti and began to settle the islands around A. D. 750. Fuchs 4; 1 Kuykendall 3; see also G. Daws, Shoal of Time: A History of the Hawaiian Islands xii–xiii (1968) (Marquesas Islands and Tahiti). When England's Captain Cook made landfall in Hawaii on his expedition in 1778, the Hawaiian people had developed, over the preceding 1,000 years or so, a cultural and political structure of their own. They had well-established traditions and customs and practiced a polytheistic religion. Agriculture and fishing sustained the people, and, though population estimates vary, some modern historians conclude that the population in 1778 was about 200,000–300,000. See Fuchs 4; R. Schmitt, Historical Statistics of Hawaii 7 (1977) (hereinafter Schmitt). The accounts of Hawaiian life often remark upon the people's capacity to find beauty and pleasure in their island existence, but life was not altogether idyllic. In Cook's time the islands were ruled by four different kings, and intra-Hawaiian wars could inflict great loss and suffering. Kings or principal chieftains, as well as high priests, could order the death or sacrifice of any subject. The society was one, however, with its own identity, its own cohesive forces, its own history.

In the years after Cook's voyage many expeditions would follow. A few members of the ships' companies remained on

the islands, some as authorized advisers, others as deserters. Their intermarriage with the inhabitants of Hawaii was not infrequent.

In 1810, the islands were united as one kingdom under the leadership of an admired figure in Hawaiian history, Kamehameha I. It is difficult to say how many settlers from Europe and America were in Hawaii when the King consolidated his power. One historian estimates there were no more than 60 or so settlers at that time. 1 Kuykendall 27. An influx was soon to follow. Beginning about 1820, missionaries arrived, of whom Congregationalists from New England were dominant in the early years. They sought to teach Hawaiians to abandon religious beliefs and customs that were contrary to Christian teachings and practices.

The 1800's are a story of increasing involvement of westerners in the economic and political affairs of the Kingdom. Rights to land became a principal concern, and there was unremitting pressure to allow non-Hawaiians to use and to own land and to be secure in their title. Westerners were not the only ones with pressing concerns, however, for the disposition and ownership of land came to be an unsettled matter among the Hawaiians themselves.

The status of Hawaiian lands has presented issues of complexity and controversy from at least the rule of Kamehameha I to the present day. We do not attempt to interpret that history, lest our comments be thought to bear upon issues not before us. It suffices to refer to various of the historical conclusions that appear to have been persuasive to Congress and to the State when they enacted the laws soon to be discussed.

When Kamehameha I came to power, he reasserted suzerainty over all lands and provided for control of parts of them by a system described in our own cases as "feudal." *Hawaii Housing Authority* v. *Midkiff,* 467 U. S. 229, 232 (1984); *Kaiser Aetna* v. *United States,* 444 U. S. 164, 166 (1979). A well-known description of the King's early decrees is con-

tained in an 1864 opinion of the Supreme Court of the Kingdom of Hawaii. The court, in turn, drew extensively upon an earlier report which recited, in part, as follows:

> " 'When the islands were conquered by Kamehameha I., he followed the example of his predecessors, and divided out the lands among his principal warrior chiefs, retaining, however, a portion in his own hands to be cultivated or managed by his own immediate servants or attendants. Each principal chief divided his lands anew and gave them out to an inferior order of chiefs or persons of rank, by whom they were subdivided again and again after (often) passing through the hands of four, five or six persons from the King down to the lowest class of tenants. All these persons were considered to have rights in the lands, or the productions of them, the proportions of which rights were not clearly defined, although universally acknowledged. . . . The same rights which the King possessed over the superior landlords and all under them, the several grades of landlords possessed over their inferiors, so that there was a joint ownership of the land, the King really owning the allodium, and the person in whose hands he placed the land, holding it in trust.' " *In re Estate of His Majesty Kamehameha IV*, 2 Haw. 715, 718–719 (quoting Principles Adopted by the Board of Commissioners to Quiet Land Titles, 2 Stat. Laws 81–82 (Haw. Kingdom 1847)).

Beginning in 1839 and through the next decade, a successive ruler, Kamehameha III, approved a series of decrees and laws designed to accommodate demands for ownership and security of title. In the words of the Hawaiian Supreme Court, "[t]he subject of rights in land was one of daily increasing importance to the newly formed Government, for it was obvious that the internal resources of the country could not be developed until the system of undivided and undefined ownership in land should be abolished." 2 Haw., at 721.

Arrangements were made to confer freehold title in some lands to certain chiefs and other individuals. The King retained vast lands for himself, and directed that other extensive lands be held by the government, which by 1840 had adopted the first Constitution of the islands. Thus was effected a fundamental and historic division, known as the Great Mahele. In 1850, foreigners, in turn, were given the right of land ownership.

The new policies did not result in wide dispersal of ownership. Though some provisions had been attempted by which tenants could claim lands, these proved ineffective in many instances, and ownership became concentrated. In 1920, the Congress of the United States, in a Report on the bill establishing the Hawaiian Homes Commission, made an assessment of Hawaiian land policy in the following terms:

"Your committee thus finds that since the institution of private ownership of lands in Hawaii the native Hawaiians, outside of the King and the chiefs, were granted and have held but a very small portion of the lands of the Islands. Under the homestead laws somewhat more than a majority of the lands were homesteaded to Hawaiians, but a great many of these lands have been lost through improvidence and inability to finance farming operations. Most frequently, however, the native Hawaiian, with no thought of the future, has obtained the land for a nominal sum, only to turn about and sell it to wealthy interests for a sum more nearly approaching its real value. The Hawaiians are not business men and have shown themselves unable to meet competitive conditions unaided. In the end the speculators are the real beneficiaries of the homestead laws. Thus the tax returns for 1919 show that only 6.23 per centum of the property of the Islands is held by native Hawaiians and this for the most part is lands in the possession of approximately a thousand wealthy Hawaiians, the

descendents of the chiefs." H. R. Rep. No. 839, 66th Cong., 2d Sess., 6 (1920).

While these developments were unfolding, the United States and European powers made constant efforts to protect their interests and to influence Hawaiian political and economic affairs in general. The first "articles of arrangement" between the United States and the Kingdom of Hawaii were signed in 1826, 8 Department of State, Treaties and Other International Agreements of the United States of America 1776–1949, p. 861 (C. Bevans comp. 1968), and additional treaties and conventions between the two countries were signed in 1849, 1875, and 1887, see Treaty with the Hawaiian Islands, 9 Stat. 977 (1849) (friendship, commerce, and navigation); Convention between the United States of America and His Majesty the King of the Hawaiian Islands, 19 Stat. 625 (1875) (commercial reciprocity); Supplementary Convention between the United States of America and His Majesty the King of the Hawaiian Islands, 25 Stat. 1399 (1887) (same). The United States was not the only country interested in Hawaii and its affairs, but by the later part of the century the reality of American dominance in trade, settlement, economic expansion, and political influence became apparent.

Tensions intensified between an anti-Western, pro-native bloc in the government on the one hand and western business interests and property owners on the other. The conflicts came to the fore in 1887. Westerners forced the resignation of the Prime Minister of the Kingdom of Hawaii and the adoption of a new Constitution, which, among other things, reduced the power of the monarchy and extended the right to vote to non-Hawaiians. 3 Kuykendall 344–372.

Tensions continued through 1893, when they again peaked, this time in response to an attempt by the then-Hawaiian monarch, Queen Liliuokalani, to promulgate a new constitution restoring monarchical control over the House of Nobles and limiting the franchise to Hawaiian subjects. A so-called

Committee of Safety, a group of professionals and business-men, with the active assistance of John Stevens, the United States Minister to Hawaii, acting with United States Armed Forces, replaced the monarchy with a provisional government. That government sought annexation by the United States. On December 18 of the same year, President Cleveland, unimpressed and indeed offended by the actions of the American Minister, denounced the role of the American forces and called for restoration of the Hawaiian monarchy. Message of the President to the Senate and House of Representatives, reprinted in H. R. Rep. No. 243, 53d Cong., 2d Sess., 3–15 (1893). The Queen could not resume her former place, however, and, in 1894, the provisional government established the Republic of Hawaii. The Queen abdicated her throne a year later.

In 1898, President McKinley signed a Joint Resolution, sometimes called the Newlands Resolution, to annex the Hawaiian Islands as territory of the United States. 30 Stat. 750. According to the Joint Resolution, the Republic of Hawaii ceded all former Crown, government, and public lands to the United States. *Ibid.* The resolution further provided that revenues from the public lands were to be "used solely for the benefit of the inhabitants of the Hawaiian Islands for educational and other public purposes." *Ibid.* Two years later the Hawaiian Organic Act established the Territory of Hawaii, asserted United States control over the ceded lands, and put those lands "in the possession, use, and control of the government of the Territory of Hawaii . . . until otherwise provided for by Congress." Act of Apr. 30, 1900, ch. 339, §91, 31 Stat. 159.

In 1993, a century after the intervention by the Committee of Safety, the Congress of the United States reviewed this history, and in particular the role of Minister Stevens. Congress passed a Joint Resolution recounting the events in some detail and offering an apology to the native Hawaiian people. 107 Stat. 1510.

Before we turn to the relevant provisions two other important matters, which affected the demographics of Hawaii, must be recounted. The first is the tragedy inflicted on the early Hawaiian people by the introduction of western diseases and infectious agents. As early as the establishment of the rule of Kamehameha I, it was becoming apparent that the native population had serious vulnerability to diseases borne to the islands by settlers. High mortality figures were experienced in infancy and adulthood, even from common illnesses such as diarrhea, colds, and measles. Fuchs 13; see Schmitt 58. More serious diseases took even greater tolls. In the smallpox epidemic of 1853, thousands of lives were lost. *Ibid.* By 1878, 100 years after Cook's arrival, the native population had been reduced to about 47,500 people. *Id.*, at 25. These mortal illnesses no doubt were an initial cause of the despair, disenchantment, and despondency some commentators later noted in descendents of the early Hawaiian people. See Fuchs 13.

The other important feature of Hawaiian demographics to be noted is the immigration to the islands by people of many different races and cultures. Mostly in response to the demand of the sugar industry for arduous labor in the cane fields, successive immigration waves brought Chinese, Portuguese, Japanese, and Filipinos to Hawaii. Beginning with the immigration of 293 Chinese in 1852, the plantations alone drew to Hawaii, in one estimate, something over 400,000 men, women, and children over the next century. *Id.*, at 24; A. Lind, Hawaii's People 6–7 (4th ed. 1980). Each of these ethnic and national groups has had its own history in Hawaii, its own struggles with societal and official discrimination, its own successes, and its own role in creating the present society of the islands. See E. Nordyke, The Peopling of Hawai'i 28–98 (2d ed. 1989). The 1990 census figures show the resulting ethnic diversity of the Hawaiian population. U. S. Dept. of Commerce, Bureau of Census, 1990 Census of Popu-

lation, Supplementary Reports, Detailed Ancestry Groups for States (Oct. 1992).

With this background we turn to the legislative enactments of direct relevance to the case before us.

## II

Not long after the creation of the new Territory, Congress became concerned with the condition of the native Hawaiian people. See H. R. Rep. No. 839, at 2–6; Hearings on the Rehabilitation and Colonization of Hawaiians and Other Proposed Amendments to the Organic Act of the Territory of Hawaii before the House Committee on the Territories, 66th Cong., 2d Sess. (1920). Reciting its purpose to rehabilitate the native Hawaiian population, see H. R. Rep. No. 839, at 1–2, Congress enacted the Hawaiian Homes Commission Act, which set aside about 200,000 acres of the ceded public lands and created a program of loans and long-term leases for the benefit of native Hawaiians. Act of July 9, 1921, ch. 42, 42 Stat. 108. The Act defined "native Hawaiian[s]" to include "any descendant of not less than one-half part of the blood of the races inhabiting the Hawaiian Islands previous to 1778." *Ibid.*

Hawaii was admitted as the 50th State of the Union in 1959. With admission, the new State agreed to adopt the Hawaiian Homes Commission Act as part of its own Constitution. Pub. L. 86–3, §§ 4, 7, 73 Stat. 5, 7 (Admission Act); see Haw. Const., Art. XII, §§ 1–3. In addition, the United States granted Hawaii title to all public lands and public property within the boundaries of the State, save those which the Federal Government retained for its own use. Admission Act §§ 5(b)–(d), 73 Stat. 5. This grant included the 200,000 acres set aside under the Hawaiian Homes Commission Act and almost 1.2 million additional acres of land. Brief for United States as *Amicus Curiae* 4.

The legislation authorizing the grant recited that these lands, and the proceeds and income they generated, were to

be held "as a public trust" to be "managed and disposed of for one or more of" five purposes:

"[1] for the support of the public schools and other public educational institutions, [2] for the betterment of the conditions of native Hawaiians, as defined in the Hawaiian Homes Commission Act, 1920, as amended, [3] for the development of farm and home ownership on as widespread a basis as possible[,] [4] for the making of public improvements, and [5] for the provision of lands for public use." Admission Act § 5(f), 73 Stat. 6.

In the first decades following admission, the State apparently continued to administer the lands that had been set aside under the Hawaiian Homes Commission Act for the benefit of native Hawaiians. The income from the balance of the public lands is said to have "by and large flowed to the department of education." Hawaii Senate Journal, Standing Committee Rep. No. 784, pp. 1350, 1351 (1979).

In 1978 Hawaii amended its Constitution to establish the Office of Hawaiian Affairs, Haw. Const., Art. XII, § 5, which has as its mission "[t]he betterment of conditions of native Hawaiians . . . [and] Hawaiians," Haw. Rev. Stat. § 10–3 (1993). Members of the 1978 constitutional convention, at which the new amendments were drafted and proposed, set forth the purpose of the proposed agency:

"Members [of the Committee of the Whole] were impressed by the concept of the Office of Hawaiian Affairs which establishes a public trust entity for the benefit of the people of Hawaiian ancestry. Members foresaw that it will provide Hawaiians the right to determine the priorities which will effectuate the betterment of their condition and welfare and promote the protection and preservation of the Hawaiian race, and that it will unite Hawaiians as a people." 1 Proceedings of the Constitutional Convention of Hawaii of 1978, Committee of the Whole Rep. No. 13, p. 1018 (1980).

Implementing statutes and their later amendments vested OHA with broad authority to administer two categories of funds: a 20 percent share of the revenue from the 1.2 million acres of lands granted to the State pursuant to § 5(b) of the Admission Act, which OHA is to administer "for the betterment of the conditions of native Hawaiians," Haw. Rev. Stat. § 10–13.5 (1993), and any state or federal appropriations or private donations that may be made for the benefit of "native Hawaiians" and/or "Hawaiians," Haw. Const., Art. XII, § 6. See generally Haw. Rev. Stat. §§ 10–1 to 10–16. (The 200,000 acres set aside under the Hawaiian Homes Commission Act are administered by a separate agency. See Haw. Rev. Stat. § 26–17 (1993).) The Hawaiian Legislature has charged OHA with the mission of "[s]erving as the principal public agency . . . responsible for the performance, development, and coordination of programs and activities relating to native Hawaiians and Hawaiians," "[a]ssessing the policies and practices of other agencies impacting on native Hawaiians and Hawaiians," "conducting advocacy efforts for native Hawaiians and Hawaiians," "[a]pplying for, receiving, and disbursing, grants and donations from all sources for native Hawaiian and Hawaiian programs and services," and "[s]erving as a receptacle for reparations." § 10–3.

OHA is overseen by a nine-member board of trustees, the members of which "shall be Hawaiians" and—presenting the precise issue in this case—shall be "elected by qualified voters who are Hawaiians, as provided by law." Haw. Const., Art. XII, § 5; see Haw. Rev. Stat. §§ 13D–1, 13D–3(b)(1) (1993). The term "Hawaiian" is defined by statute:

> "'Hawaiian' means any descendant of the aboriginal peoples inhabiting the Hawaiian Islands which exercised sovereignty and subsisted in the Hawaiian Islands in 1778, and which peoples thereafter have continued to reside in Hawaii." § 10–2.

The statute defines "native Hawaiian" as follows:

"'Native Hawaiian' means any descendant of not less than one-half part of the races inhabiting the Hawaiian Islands previous to 1778, as defined by the Hawaiian Homes Commission Act, 1920, as amended; provided that the term identically refers to the descendants of such blood quantum of such aboriginal peoples which exercised sovereignty and subsisted in the Hawaiian Islands in 1778 and which peoples thereafter continued to reside in Hawaii." *Ibid.*

Petitioner Harold Rice is a citizen of Hawaii and a descendant of preannexation residents of the islands. He is not, as we have noted, a descendant of pre-1778 natives, and so he is neither "native Hawaiian" nor "Hawaiian" as defined by the statute. Rice applied in March 1996 to vote in the elections for OHA trustees. To register to vote for the office of trustee he was required to attest: "I am also Hawaiian and desire to register to vote in OHA elections." Affidavit on Application for Voter Registration, Lodging by Petitioner, Tab 2. Rice marked through the words "am also Hawaiian and," then checked the form "yes." The State denied his application.

Rice sued Benjamin Cayetano, the Governor of Hawaii, in the United States District Court for the District of Hawaii. (The Governor was sued in his official capacity, and the Attorney General of Hawaii defends the challenged enactments. We refer to the respondent as "the State.") Rice contested his exclusion from voting in elections for OHA trustees and from voting in a special election relating to native Hawaiian sovereignty which was held in August 1996. After the District Court rejected the latter challenge, see *Rice* v. *Cayetano*, 941 F. Supp. 1529 (1996) (a decision not before us), the parties moved for summary judgment on the claim that the Fourteenth and Fifteenth Amendments to the United States Constitution invalidate the law excluding Rice from the OHA trustee elections.

The District Court granted summary judgment to the State. 963 F. Supp. 1547 (Haw. 1997). Surveying the history of the islands and their people, the District Court determined that Congress and the State of Hawaii have recognized a guardian-ward relationship with the native Hawaiians, which the court found analogous to the relationship between the United States and the Indian tribes. *Id.*, at 1551–1554. On this premise, the court examined the voting qualification with the latitude that we have applied to legislation passed pursuant to Congress' power over Indian affairs. *Id.*, at 1554–1555 (citing *Morton* v. *Mancari*, 417 U. S. 535 (1974)). Finding that the electoral scheme was "rationally related to the State's responsibility under the Admission Act to utilize a portion of the proceeds from the § 5(b) lands for the betterment of Native Hawaiians," the District Court held that the voting restriction did not violate the Constitution's ban on racial classifications. 963 F. Supp., at 1554–1555.

The Court of Appeals affirmed. 146 F. 3d 1075 (CA9 1998). The court noted that Rice had not challenged the constitutionality of the underlying programs or of OHA itself. *Id.*, at 1079. Considering itself bound to "accept the trusts and their administrative structure as [it found] them, and assume that both are lawful," the court held that Hawaii "may rationally conclude that Hawaiians, being the group to whom trust obligations run and to whom OHA trustees owe a duty of loyalty, should be the group to decide who the trustees ought to be." *Ibid.* The court so held notwithstanding its clear holding that the Hawaii Constitution and implementing statutes "contain a racial classification on their face." *Ibid.*

We granted certiorari, 526 U. S. 1016 (1999), and now reverse.

### III

The purpose and command of the Fifteenth Amendment are set forth in language both explicit and comprehensive.

512

The National Government and the States may not violate a fundamental principle: They may not deny or abridge the right to vote on account of race. Color and previous condition of servitude, too, are forbidden criteria or classifications, though it is unnecessary to consider them in the present case.

Enacted in the wake of the Civil War, the immediate concern of the Amendment was to guarantee to the emancipated slaves the right to vote, lest they be denied the civil and political capacity to protect their new freedom. Vital as its objective remains, the Amendment goes beyond it. Consistent with the design of the Constitution, the Amendment is cast in fundamental terms, terms transcending the particular controversy which was the immediate impetus for its enactment. The Amendment grants protection to all persons, not just members of a particular race.

The design of the Amendment is to reaffirm the equality of races at the most basic level of the democratic process, the exercise of the voting franchise. A resolve so absolute required language as simple in command as it was comprehensive in reach. Fundamental in purpose and effect and self-executing in operation, the Amendment prohibits all provisions denying or abridging the voting franchise of any citizen or class of citizens on the basis of race. "[B]y the inherent power of the Amendment the word white disappeared" from our voting laws, bringing those who had been excluded by reason of race within "the generic grant of suffrage made by the State." *Guinn* v. *United States*, 238 U. S. 347, 363 (1915); see also *Neal* v. *Delaware*, 103 U. S. 370, 389 (1881). The Court has acknowledged the Amendment's mandate of neutrality in straightforward terms: "If citizens of one race having certain qualifications are permitted by law to vote, those of another having the same qualifications must be. Previous to this amendment, there was no constitutional guaranty against this discrimination: now there is." *United States* v. *Reese*, 92 U. S. 214, 218 (1876).

Though the commitment was clear, the reality remained far from the promise. Manipulative devices and practices were soon employed to deny the vote to blacks. We have cataloged before the "variety and persistence" of these techniques. *South Carolina* v. *Katzenbach*, 383 U. S. 301, 311–312 (1966) (citing, *e. g., Guinn, supra* (grandfather clause); *Myers* v. *Anderson*, 238 U. S. 368 (1915) (same); *Lane* v. *Wilson*, 307 U. S. 268 (1939) ("procedural hurdles"); *Terry* v. *Adams*, 345 U. S. 461 (1953) (white primary); *Smith* v. *Allwright*, 321 U. S. 649 (1944) (same); *United States* v. *Thomas*, 362 U. S. 58 (1960) *(per curiam)* (registration challenges); *Gomillion* v. *Lightfoot*, 364 U. S. 339 (1960) (racial gerrymandering); *Louisiana* v. *United States*, 380 U. S. 145 (1965) ("interpretation tests")). Progress was slow, particularly when litigation had to proceed case by case, district by district, sometimes voter by voter. See 383 U. S., at 313–315.

Important precedents did emerge, however, which give instruction in the case now before us. The Fifteenth Amendment was quite sufficient to invalidate a scheme which did not mention race but instead used ancestry in an attempt to confine and restrict the voting franchise. In 1910, the State of Oklahoma enacted a literacy requirement for voting eligibility, but exempted from that requirement the " 'lineal descendant[s]' " of persons who were " 'on January 1, 1866, or at any time prior thereto, entitled to vote under any form of government, or who at that time resided in some foreign nation.' " *Guinn, supra*, at 357. Those persons whose ancestors were entitled to vote under the State's previous, discriminatory voting laws were thus exempted from the eligibility test. Recognizing that the test served only to perpetuate those old laws and to effect a transparent racial exclusion, the Court invalidated it. 238 U. S., at 364–365.

More subtle, perhaps, than the grandfather device in *Guinn* were the evasions attempted in the white primary cases; but the Fifteenth Amendment, again by its own terms, sufficed to strike down these voting systems, systems de-

signed to exclude one racial class (at least) from voting. See *Terry, supra,* at 469–470; *Allwright, supra,* at 663–666 (overruling *Grovey* v. *Townsend,* 295 U. S. 45 (1935)). The Fifteenth Amendment, the Court held, could not be so circumvented: "The Amendment bans racial discrimination in voting by both state and nation. It thus establishes a national policy . . . not to be discriminated against as voters in elections to determine public governmental policies or to select public officials, national, state, or local." *Terry, supra,* at 467.

Unlike the cited cases, the voting structure now before us is neither subtle nor indirect. It is specific in granting the vote to persons of defined ancestry and to no others. The State maintains this is not a racial category at all but instead a classification limited to those whose ancestors were in Hawaii at a particular time, regardless of their race. Brief for Respondent 38–40. The State points to theories of certain scholars concluding that some inhabitants of Hawaii as of 1778 may have migrated from the Marquesas Islands and the Pacific Northwest, as well as from Tahiti. *Id.,* at 38–39, and n. 15. Furthermore, the State argues, the restriction in its operation excludes a person whose traceable ancestors were exclusively Polynesian if none of those ancestors resided in Hawaii in 1778; and, on the other hand, the vote would be granted to a person who could trace, say, one sixty-fourth of his or her ancestry to a Hawaiian inhabitant on the pivotal date. *Ibid.* These factors, it is said, mean the restriction is not a racial classification. We reject this line of argument.

Ancestry can be a proxy for race. It is that proxy here. Even if the residents of Hawaii in 1778 had been of more diverse ethnic backgrounds and cultures, it is far from clear that a voting test favoring their descendants would not be a race-based qualification. But that is not this case. For centuries Hawaii was isolated from migration. 1 Kuykendall 3. The inhabitants shared common physical character-

istics, and by 1778 they had a common culture. Indeed, the drafters of the statutory definition in question emphasized the "unique culture of the ancient Hawaiians" in explaining their work. Hawaii Senate Journal, Standing Committee Rep. No. 784, at 1354; see *ibid.* ("Modern scholarship also identified such race of people as culturally distinguishable from other Polynesian peoples"). The provisions before us reflect the State's effort to preserve that commonality of people to the present day. In the interpretation of the Reconstruction era civil rights laws we have observed that "racial discrimination" is that which singles out "identifiable classes of persons . . . solely because of their ancestry or ethnic characteristics." *Saint Francis College* v. *Al-Khazraji*, 481 U. S. 604, 613 (1987). The very object of the statutory definition in question and of its earlier congressional counterpart in the Hawaiian Homes Commission Act is to treat the early Hawaiians as a distinct people, commanding their own recognition and respect. The State, in enacting the legislation before us, has used ancestry as a racial definition and for a racial purpose.

The history of the State's definition demonstrates the point. As we have noted, the statute defines "Hawaiian" as

> "any descendant of the aboriginal peoples inhabiting the Hawaiian Islands which exercised sovereignty and subsisted in the Hawaiian Islands in 1778, and which peoples thereafter have continued to reside in Hawaii." Haw. Rev. Stat. § 10–2 (1993).

A different definition of "Hawaiian" was first promulgated in 1978 as one of the proposed amendments to the State Constitution. As proposed, "Hawaiian" was defined as "any descendant of the races inhabiting the Hawaiian Islands, previous to 1778." 1 Proceedings of the Constitutional Convention of Hawaii of 1978, Committee of the Whole Rep. No. 13, at 1018. Rejected as not ratified in a valid manner, see *Kahalekai* v. *Doi*, 60 Haw. 324, 342, 590 P. 2d 543, 555 (1979),

the definition was modified and in the end promulgated in statutory form as quoted above. See Hawaii Senate Journal, Standing Committee Rep. No. 784, at 1350, 1353–1354; *id.*, Conf. Comm. Rep. No. 77, at 998. By the drafters' own admission, however, any changes to the language were at most cosmetic. Noting that "[t]he definitions of 'native Hawaiian' and 'Hawaiian' are changed to substitute 'peoples' for 'races,'" the drafters of the revised definition "stress[ed] that this change is non-substantive, and that 'peoples' does mean 'races.'" *Ibid.*; see also *id.*, at 999 ("[T]he word 'peoples' has been substituted for 'races' in the definition of 'Hawaiian'. Again, your Committee wishes to emphasize that this substitution is merely technical, and that 'peoples' does mean 'races'").

The next definition in Hawaii's compilation of statutes incorporates the new definition of "Hawaiian" and preserves the explicit tie to race:

> "'Native Hawaiian' means any descendant of not less than one-half part of the races inhabiting the Hawaiian Islands previous to 1778, as defined by the Hawaiian Homes Commission Act, 1920, as amended; provided that the term identically refers to the descendants of such blood quantum of such aboriginal peoples which exercised sovereignty and subsisted in the Hawaiian Islands in 1778 and which peoples thereafter continued to reside in Hawaii." Haw. Rev. Stat. § 10–2 (1993).

This provision makes it clear: "[T]he descendants . . . of [the] aboriginal peoples" means "the descendants . . . of the races." *Ibid.*

As for the further argument that the restriction differentiates even among Polynesian people and is based simply on the date of an ancestor's residence in Hawaii, this too is insufficient to prove the classification is nonracial in purpose and operation. Simply because a class defined by ancestry does not include all members of the race does not suffice to

make the classification race neutral. Here, the State's argument is undermined by its express racial purpose and by its actual effects.

The ancestral inquiry mandated by the State implicates the same grave concerns as a classification specifying a particular race by name. One of the principal reasons race is treated as a forbidden classification is that it demeans the dignity and worth of a person to be judged by ancestry instead of by his or her own merit and essential qualities. An inquiry into ancestral lines is not consistent with respect based on the unique personality each of us possesses, a respect the Constitution itself secures in its concern for persons and citizens.

The ancestral inquiry mandated by the State is forbidden by the Fifteenth Amendment for the further reason that the use of racial classifications is corruptive of the whole legal order democratic elections seek to preserve. The law itself may not become the instrument for generating the prejudice and hostility all too often directed against persons whose particular ancestry is disclosed by their ethnic characteristics and cultural traditions. "Distinctions between citizens solely because of their ancestry are by their very nature odious to a free people whose institutions are founded upon the doctrine of equality." *Hirabayashi* v. *United States*, 320 U. S. 81, 100 (1943). Ancestral tracing of this sort achieves its purpose by creating a legal category which employs the same mechanisms, and causes the same injuries, as laws or statutes that use race by name. The State's electoral restriction enacts a race-based voting qualification.

## IV

The State offers three principal defenses of its voting law, any of which, it contends, allows it to prevail even if the classification is a racial one under the Fifteenth Amendment. We examine, and reject, each of these arguments.

## A

The most far reaching of the State's arguments is that exclusion of non-Hawaiians from voting is permitted under our cases allowing the differential treatment of certain members of Indian tribes. The decisions of this Court, interpreting the effect of treaties and congressional enactments on the subject, have held that various tribes retained some elements of quasi-sovereign authority, even after cession of their lands to the United States. See *Brendale* v. *Confederated Tribes and Bands of Yakima Nation,* 492 U. S. 408, 425 (1989) (plurality opinion); *Oliphant* v. *Suquamish Tribe,* 435 U. S. 191, 208 (1978). The retained tribal authority relates to self-governance. *Brendale, supra,* at 425 (plurality opinion). In reliance on that theory the Court has sustained a federal provision giving employment preferences to persons of tribal ancestry. *Mancari,* 417 U. S., at 553–555. The *Mancari* case, and the theory upon which it rests, are invoked by the State to defend its decision to restrict voting for the OHA trustees, who are charged so directly with protecting the interests of native Hawaiians.

If Hawaii's restriction were to be sustained under *Mancari* we would be required to accept some beginning premises not yet established in our case law. Among other postulates, it would be necessary to conclude that Congress, in reciting the purposes for the transfer of lands to the State—and in other enactments such as the Hawaiian Homes Commission Act and the Joint Resolution of 1993—has determined that native Hawaiians have a status like that of Indians in organized tribes, and that it may, and has, delegated to the State a broad authority to preserve that status. These propositions would raise questions of considerable moment and difficulty. It is a matter of some dispute, for instance, whether Congress may treat the native Hawaiians as it does the Indian tribes. Compare Van Dyke, The Political Status of the Native Hawaiian People, 17 Yale L. & Pol'y Rev. 95 (1998), with Benjamin, Equal Protection and the Special Re-

lationship: The Case of Native Hawaiians, 106 Yale L. J. 537 (1996). We can stay far off that difficult terrain, however.

The State's argument fails for a more basic reason. Even were we to take the substantial step of finding authority in Congress, delegated to the State, to treat Hawaiians or native Hawaiians as tribes, Congress may not authorize a State to create a voting scheme of this sort.

Of course, as we have established in a series of cases, Congress may fulfill its treaty obligations and its responsibilities to the Indian tribes by enacting legislation dedicated to their circumstances and needs. See *Washington* v. *Washington State Commercial Passenger Fishing Vessel Assn.*, 443 U. S. 658, 673, n. 20 (1979) (treaties securing preferential fishing rights); *United States* v. *Antelope*, 430 U. S. 641, 645–647 (1977) (exclusive federal jurisdiction over crimes committed by Indians in Indian country); *Delaware Tribal Business Comm.* v. *Weeks*, 430 U. S. 73, 84–85 (1977) (distribution of tribal property); *Moe* v. *Confederated Salish and Kootenai Tribes of Flathead Reservation*, 425 U. S. 463, 479–480 (1976) (Indian immunity from state taxes); *Fisher* v. *District Court of Sixteenth Judicial Dist. of Mont.*, 424 U. S. 382, 390–391 (1976) *(per curiam)* (exclusive tribal court jurisdiction over tribal adoptions). As we have observed, "every piece of legislation dealing with Indian tribes and reservations . . . single[s] out for special treatment a constituency of tribal Indians." *Mancari, supra,* at 552.

*Mancari,* upon which many of the above cases rely, presented the somewhat different issue of a preference in hiring and promoting at the federal Bureau of Indian Affairs (BIA), a preference which favored individuals who were "'one-fourth or more degree Indian blood and . . . member[s] of a Federally-recognized tribe.'" 417 U. S., at 553, n. 24 (quoting 44 BIAM 335, 3.1 (1972)). Although the classification had a racial component, the Court found it important that the preference was "not directed towards a 'racial' group consisting of 'Indians,'" but rather "only to members of 'fed-

erally recognized' tribes." 417 U. S., at 553, n. 24. "In this sense," the Court held, "the preference [was] political rather than racial in nature." *Ibid.;* see also *id.,* at 554 ("The preference, as applied, is granted to Indians not as a discrete racial group, but, rather, as members of quasi-sovereign tribal entities whose lives and activities are governed by the BIA in a unique fashion"). Because the BIA preference could be "tied rationally to the fulfillment of Congress' unique obligation toward the Indians," and was "reasonable and rationally designed to further Indian self-government," the Court held that it did not offend the Constitution. *Id.,* at 555. The opinion was careful to note, however, that the case was confined to the authority of the BIA, an agency described as *"sui generis." Id.,* at 554.

Hawaii would extend the limited exception of *Mancari* to a new and larger dimension. The State contends that "one of the very purposes of OHA—and the challenged voting provision—is to afford Hawaiians a measure of self-governance," and so it fits the model of *Mancari.* Brief for Respondent 34. It does not follow from *Mancari,* however, that Congress may authorize a State to establish a voting scheme that limits the electorate for its public officials to a class of tribal Indians, to the exclusion of all non-Indian citizens.

The tribal elections established by the federal statutes the State cites illuminate its error. See Brief for Respondent 22 (citing, *e. g.,* the Menominee Restoration Act, 25 U. S. C. § 903b, and the Indian Reorganization Act, 25 U. S. C. § 476). If a non-Indian lacks a right to vote in tribal elections, it is for the reason that such elections are the internal affair of a quasi sovereign. The OHA elections, by contrast, are the affair of the State of Hawaii. OHA is a state agency, established by the State Constitution, responsible for the administration of state laws and obligations. See Haw. Const., Art. XII, §§ 5–6. The Hawaiian Legislature has declared that OHA exists to serve "as the principal public agency in th[e]

State responsible for the performance, development, and coordination of programs and activities relating to native Hawaiians and Hawaiians." Haw. Rev. Stat. § 10–3(3) (1993); see also Lodging by Petitioner, Tab 6, OHA Annual Report 1993–1994, p. 5 (May 27, 1994) (admitting that "OHA is technically a part of the Hawai'i state government," while asserting that "it operates as a semi-autonomous entity"). Foremost among the obligations entrusted to this agency is the administration of a share of the revenues and proceeds from public lands, granted to Hawaii to "be held by said State as a public trust." Admission Act §§ 5(b), (f), 73 Stat. 5, 6; see Haw. Const., Art. XII, § 4.

The delegates to the 1978 constitutional convention explained the position of OHA in the state structure:

> "The committee intends that the Office of Hawaiian Affairs will be independent from the executive branch and all other branches of government although it will assume the status of a state agency. The chairman may be an ex officio member of the governor's cabinet. The status of the Office of Hawaiian Affairs is to be unique and special. . . . The committee developed this office based on the model of the University of Hawaii. In particular, the committee desired to use this model so that the office could have maximum control over its budget, assets and personnel. The committee felt that it was important to arrange a method whereby the assets of Hawaiians could be kept separate from the rest of the state treasury." 1 Proceedings of the Constitutional Convention of Hawaii of 1978, Standing Committee Rep. No. 59, at 645.

Although it is apparent that OHA has a unique position under state law, it is just as apparent that it remains an arm of the State.

The validity of the voting restriction is the only question before us. As the Court of Appeals did, we assume the va-

lidity of the underlying administrative structure and trusts, without intimating any opinion on that point. Nonetheless, the elections for OHA trustee are elections of the State, not of a separate quasi sovereign, and they are elections to which the Fifteenth Amendment applies. To extend *Mancari* to this context would be to permit a State, by racial classification, to fence out whole classes of its citizens from decision-making in critical state affairs. The Fifteenth Amendment forbids this result.

## B

Hawaii further contends that the limited voting franchise is sustainable under a series of cases holding that the rule of one person, one vote does not pertain to certain special purpose districts such as water or irrigation districts. See *Ball v. James*, 451 U. S. 355 (1981); *Salyer Land Co. v. Tulare Lake Basin Water Storage Dist.*, 410 U. S. 719 (1973). Just as the *Mancari* argument would have involved a significant extension or new application of that case, so too it is far from clear that the *Salyer* line of cases would be at all applicable to statewide elections for an agency with the powers and responsibilities of OHA.

We would not find those cases dispositive in any event, however. The question before us is not the one-person, one-vote requirement of the Fourteenth Amendment, but the race neutrality command of the Fifteenth Amendment. Our special purpose district cases have not suggested that compliance with the one-person, one-vote rule of the Fourteenth Amendment somehow excuses compliance with the Fifteenth Amendment. We reject that argument here. We held four decades ago that state authority over the boundaries of political subdivisions, "extensive though it is, is met and overcome by the Fifteenth Amendment to the Constitution." *Gomillion*, 364 U. S., at 345. The Fifteenth Amendment has independent meaning and force. A State may not deny or abridge the right to vote on account of race, and this law does so.

## C

Hawaii's final argument is that the voting restriction does no more than ensure an alignment of interests between the fiduciaries and the beneficiaries of a trust. Thus, the contention goes, the restriction is based on beneficiary status rather than race.

As an initial matter, the contention founders on its own terms, for it is not clear that the voting classification is symmetric with the beneficiaries of the programs OHA administers. Although the bulk of the funds for which OHA is responsible appears to be earmarked for the benefit of "native Hawaiians," the State permits both "native Hawaiians" and "Hawaiians" to vote for the office of trustee. The classification thus appears to create, not eliminate, a differential alignment between the identity of OHA trustees and what the State calls beneficiaries.

Hawaii's argument fails on more essential grounds. The State's position rests, in the end, on the demeaning premise that citizens of a particular race are somehow more qualified than others to vote on certain matters. That reasoning attacks the central meaning of the Fifteenth Amendment. The Amendment applies to "any election in which public issues are decided or public officials selected." *Terry*, 345 U. S., at 468. There is no room under the Amendment for the concept that the right to vote in a particular election can be allocated based on race. Race cannot qualify some and disqualify others from full participation in our democracy. All citizens, regardless of race, have an interest in selecting officials who make policies on their behalf, even if those policies will affect some groups more than others. Under the Fifteenth Amendment voters are treated not as members of a distinct race but as members of the whole citizenry. Hawaii may not assume, based on race, that petitioner or any other of its citizens will not cast a principled vote. To accept the position advanced by the State would give rise to the same indignities, and the same resulting tensions and ani-

mosities, the Amendment was designed to eliminate. The voting restriction under review is prohibited by the Fifteenth Amendment.

\* \* \*

When the culture and way of life of a people are all but engulfed by a history beyond their control, their sense of loss may extend down through generations; and their dismay may be shared by many members of the larger community. As the State of Hawaii attempts to address these realities, it must, as always, seek the political consensus that begins with a sense of shared purpose. One of the necessary beginning points is this principle: The Constitution of the United States, too, has become the heritage of all the citizens of Hawaii.

In this case the Fifteenth Amendment invalidates the electoral qualification based on ancestry. The judgment of the Court of Appeals for the Ninth Circuit is reversed.

*It is so ordered.*

JUSTICE BREYER, with whom JUSTICE SOUTER joins, concurring in the result.

I agree with much of what the Court says and with its result, but I do not agree with the critical rationale that underlies that result. Hawaii seeks to justify its voting scheme by drawing an analogy between its Office of Hawaiian Affairs (OHA) and a trust for the benefit of an Indian tribe. The majority does not directly deny the analogy. It instead at one point assumes, at least for argument's sake, that the "revenues and proceeds" at issue are from a " 'public trust.' " *Ante,* at 521. It also assumes without deciding that the State could "treat Hawaiians or native Hawaiians as tribes." *Ante,* at 519. Leaving these issues undecided, it holds that the Fifteenth Amendment forbids Hawaii's voting scheme, because the "OHA is a state agency," and thus

election to the OHA board is not "the internal affair of a quasi sovereign," such as an Indian tribe. *Ante*, at 520.

I see no need, however, to decide this case on the basis of so vague a concept as "quasi sovereign," and I do not subscribe to the Court's consequently sweeping prohibition. Rather, in my view, we should reject Hawaii's effort to justify its rules through analogy to a trust for an Indian tribe because the record makes clear that (1) there is no "trust" for native Hawaiians here, and (2) OHA's electorate, as defined in the statute, does not sufficiently resemble an Indian tribe.

The majority seems to agree, though it does not decide, that the OHA bears little resemblance to a trust for native Hawaiians. It notes that the Hawaii Constitution uses the word "trust" when referring to the 1.2 million acres of land granted in the Admission Act. *Ante*, at 508, 521. But the Admission Act itself makes clear that the 1.2 million acres is to benefit *all* the people of Hawaii. The Act specifies that the land is to be used for the education of, the developments of homes and farms for, the making of public improvements for, and public use by, *all* of Hawaii's citizens, as well as for the betterment of those who are "native." Admission Act § 5(f).

Moreover, OHA funding comes from several different sources. See, *e. g.*, OHA Fiscal 1998 Annual Report 38 (hereinafter Annual Report) ($15 million from the 1.2 million acres of public lands; $11 million from "[d]ividend and interest income"; $3 million from legislative appropriations; $400,000 from federal and other grants). All of OHA's funding is authorized by ordinary state statutes. See, *e. g.*, Haw. Rev. Stat. §§ 10–4, 10–6, 10–13.5 (1993); see also Annual Report 11 ("OHA's fiscal 1998–99 legislative budget was passed as Acts 240 and 115 by the 1997 legislature"). The amounts of funding and funding sources are thus subject to change by ordinary legislation. OHA spends most, but not all, of its money to benefit native Hawaiians in many different ways. See Annual Report (OHA projects support education, hous-

ing, health, culture, economic development, and nonprofit organizations). As the majority makes clear, OHA is simply a special purpose department of Hawaii's state government. *Ante,* at 520–521.

As importantly, the statute defines the electorate in a way that is not analogous to membership in an Indian tribe. Native Hawaiians, considered as a group, may be analogous to tribes of other Native Americans. But the statute does not limit the electorate to native Hawaiians. Rather it adds to approximately 80,000 native Hawaiians about 130,000 additional "Hawaiians," defined as including anyone with one ancestor who lived in Hawaii prior to 1778, thereby including individuals who are less than one five-hundredth original Hawaiian (assuming nine generations between 1778 and the present). See Native Hawaiian Data Book 39 (1998). Approximately 10% to 15% of OHA's funds are spent specifically to benefit this latter group, see Annual Report 38, which now constitutes about 60% of the OHA electorate.

I have been unable to find any Native American tribal definition that is so broad. The Alaska Native Claims Settlement Act, for example, defines a "Native" as "a person of one-fourth degree or more Alaska Indian" or one "who is regarded as an Alaska Native by the Native village or Native group of which he claims to be a member and whose father or mother is . . . regarded as Native by any village or group" (a classification perhaps more likely to reflect real group membership than any blood quantum requirement). 43 U. S. C. § 1602(b). Many tribal constitutions define membership in terms of having had an ancestor whose name appeared on a tribal roll—but in the far less distant past. See, *e. g.,* Constitution of the Choctaw Nation of Oklahoma, Art. II (membership consists of persons on final rolls approved in 1906 and their lineal descendants); Constitution of the Sac and Fox Tribe of Indians of Oklahoma, Art. II (membership consists of persons on official roll of 1937, children since born to two members of the Tribe, and children born to one mem-

ber and a nonmember if admitted by the council); Revised Constitution of the Jicarilla Apache Tribe, Art. III (membership consists of persons on official roll of 1968 and children of one member of the Tribe who are at least three-eighths Jicarilla Apache Indian blood); Revised Constitution Mescalero Apache Tribe, Art. IV (membership consists of persons on the official roll of 1936 and children born to at least one enrolled member who are at least one-fourth degree Mescalero Apache blood).

Of course, a Native American tribe has broad authority to define its membership. See *Santa Clara Pueblo* v. *Martinez,* 436 U. S. 49, 72, n. 32 (1978). There must, however, be some limit on what is reasonable, at the least when a State (which is not itself a tribe) creates the definition. And to define that membership in terms of 1 possible ancestor out of 500, thereby creating a vast and unknowable body of potential members—leaving some combination of luck and interest to determine which potential members become actual voters—goes well beyond any reasonable limit. It was not a tribe, but rather the State of Hawaii, that created this definition; and, as I have pointed out, it is not like any actual membership classification created by any actual tribe.

These circumstances are sufficient, in my view, to destroy the analogy on which Hawaii's justification must depend. This is not to say that Hawaii's definitions themselves independently violate the Constitution, cf. *post,* at 535–536, n. 11 (JUSTICE STEVENS, dissenting); it is only to say that the analogies they here offer are too distant to save a race-based voting definition that in their absence would clearly violate the Fifteenth Amendment. For that reason I agree with the majority's ultimate conclusion.

JUSTICE STEVENS, with whom JUSTICE GINSBURG joins as to Part II, dissenting.

The Court's holding today rests largely on the repetition of glittering generalities that have little, if any, application

to the compelling history of the State of Hawaii. When that history is held up against the manifest purpose of the Fourteenth and Fifteenth Amendments, and against two centuries of this Court's federal Indian law, it is clear to me that Hawaii's election scheme should be upheld.

## I

According to the terms of the federal Act by which Hawaii was admitted to the Union, and to the terms of that State's Constitution and laws, the Office of Hawaiian Affairs (OHA) is charged with managing vast acres of land held in trust for the descendants of the Polynesians who occupied the Hawaiian Islands before the 1778 arrival of Captain Cook. In addition to administering the proceeds from these assets, OHA is responsible for programs providing special benefits for native Hawaiians. Established in 1978 by an amendment to the State Constitution, OHA was intended to advance multiple goals: to carry out the duties of the trust relationship between the islands' indigenous peoples and the Government of the United States; to compensate for past wrongs to the ancestors of these peoples; and to help preserve the distinct, indigenous culture that existed for centuries before Cook's arrival. As explained by the senior Senator from Hawaii, Senator Inouye, who is not himself a native Hawaiian but rather (like petitioner) is a member of the majority of Hawaiian voters who supported the 1978 amendments, the amendments reflect "an honest and sincere attempt on the part of the people of Hawai'i to rectify the wrongs of the past, and to put into being the mandate [of] our Federal government—the betterment of the conditions of Native Hawaiians."[1]

---

[1] App. E to Brief for Hawai'i Congressional Delegation as *Amicus Curiae* E–3. In a statement explaining the cultural motivation for the amendments, Senator Akaka pointed out that the "fact that the entire State of Hawai'i voted to amend the State Constitution in 1978 to establish the Office of Hawaiian Affairs is significant because it illustrates the recognition of the importance of Hawaiian culture and traditions as the foundation for the *Aloha* spirit." *Id.*, at E–5.

Today the Court concludes that Hawaii's method of electing the trustees of OHA violates the Fifteenth Amendment. In reaching that conclusion, the Court has assumed that the programs administered by OHA are valid. That assumption is surely correct. In my judgment, however, the reasons supporting the legitimacy of OHA and its programs in general undermine the basis for the Court's decision holding its trustee election provision invalid. The OHA election provision violates neither the Fourteenth Amendment nor the Fifteenth.

That conclusion is in keeping with three overlapping principles. First, the Federal Government must be, and has been, afforded wide latitude in carrying out its obligations arising from the special relationship it has with the aboriginal peoples, a category that includes the native Hawaiians, whose lands are now a part of the territory of the United States. In addition, there exists in this case the State's own fiduciary responsibility—arising from its establishment of a public trust—for administering assets granted it by the Federal Government in part for the benefit of native Hawaiians. Finally, even if one were to ignore the more than two centuries of Indian law precedent and practice on which this case follows, there is simply no invidious discrimination present in this effort to see that indigenous peoples are compensated for past wrongs, and to preserve a distinct and vibrant culture that is as much a part of this Nation's heritage as any.

## II

Throughout our Nation's history, this Court has recognized both the plenary power of Congress over the affairs of Native Americans [2] and the fiduciary character of the special

---

[2] See, e. g., *Alaska* v. *Native Village of Venetie Tribal Government*, 522 U. S. 520, 531, n. 6 (1998); *United States* v. *Wheeler*, 435 U. S. 313, 319 (1978); *United States* v. *Antelope*, 430 U. S. 641, 645 (1977); *Morton* v. *Mancari*, 417 U. S. 535, 551 (1974); *Lone Wolf* v. *Hitchcock*, 187 U. S. 553, 564–565 (1903); *United States* v. *Kagama*, 118 U. S. 375 (1886).

federal relationship with descendants of those once sovereign peoples.[3] The source of the Federal Government's responsibility toward the Nation's native inhabitants, who were subject to European and then American military conquest, has been explained by this Court in the crudest terms, but they remain instructive nonetheless.

> "These Indian tribes *are* the wards of the nation. They are communities *dependent* on the United States. Dependent largely for their daily food. Dependent for their political rights. . . . From their very weakness and helplessness, so largely due to the course of dealing of the Federal Government with them and the treaties in which it has been promised, there arises the duty of protection, and with it the power. This has always been recognized by the Executive and by Congress, and by this court, whenever the question has arisen." *United States* v. *Kagama,* 118 U. S. 375, 383–384 (1886) (emphasis in original).

As our cases have consistently recognized, Congress' plenary power over these peoples has been exercised time and again to implement a federal duty to provide native peoples with special " 'care and protection.' "[4] With respect to the Pueblos in New Mexico, for example, "public moneys have been expended in presenting them with farming implements and utensils, and in their civilization and instruction." *United States* v. *Sandoval,* 231 U. S. 28, 39–40 (1913). Today, the Federal Bureau of Indian Affairs (BIA) administers countless modern programs responding to comparably pragmatic concerns, including health, education, housing, and impoverishment. See Office of the Federal Register, United States Government Manual 1999/2000, pp. 311–312. Federal regulation in this area is not limited to the strictly practical

---

[3] See, *e. g., United States* v. *Sandoval,* 231 U. S. 28 (1913); *Kagama,* 118 U. S., at 384–385; *Cherokee Nation* v. *Georgia,* 5 Pet. 1 (1831).

[4] *Sandoval,* 231 U. S., at 45; *Kagama,* 118 U. S., at 384–385.

but has encompassed as well the protection of cultural values; for example, the desecration of Native American graves and other sacred sites led to the passage of the Native American Graves Protection and Repatriation Act, 25 U. S. C. § 3001 *et seq.*

Critically, neither the extent of Congress' sweeping power nor the character of the trust relationship with indigenous peoples has depended on the ancient racial origins of the people, the allotment of tribal lands,[5] the coherence or existence of tribal self-government,[6] or the varying definitions of "Indian" Congress has chosen to adopt.[7]   Rather, when it comes to the exercise of Congress' plenary power in Indian affairs, this Court has taken account of the "numerous occasions" on which "legislation that singles out Indians for particular and special treatment" has been upheld, and has concluded that as "long as the special treatment can be tied rationally to the fulfillment of Congress' unique obligation

---

[5] See, *e. g., United States* v. *Celestine,* 215 U. S. 278, 286–287 (1909).

[6] See *United States* v. *John,* 437 U. S. 634, 653 (1978) ("Neither the fact that the Choctaws in Mississippi are merely a remnant of a larger group of Indians, long ago removed from Mississippi, nor the fact that federal supervision over them has not been continuous, destroys the federal power to deal with them"); *Delaware Tribal Business Comm.* v. *Weeks,* 430 U. S. 73, 82, n. 14, 84–85 (1977) (whether or not federal statute providing financial benefits to descendants of Delaware Tribe included nontribal Indian beneficiaries, Congress' choice need only be " 'tied rationally to the fulfillment of Congress' unique obligation toward the Indians' " (quoting *Morton* v. *Mancari,* 417 U. S., at 555)).

[7] See generally F. Cohen, Handbook of Federal Indian Law 19–20 (1982). Compare 25 U. S. C. § 479 ("The term 'Indian' as used in this Act shall include all persons of Indian descent who are members of any recognized Indian tribe now under Federal jurisdiction, and all persons who are descendants of such members who were, on June 1, 1934, residing within the present boundaries of any Indian reservation, and shall further include all other persons of one-half or more Indian blood.   For the purposes of this Act, Eskimos and other aboriginal peoples of Alaska shall be considered Indians") with § 1603(c)(3) (Indian is any person "considered by the Secretary of the Interior to be an Indian for any purpose").

towards the Indians, such legislative judgments will not be disturbed." *Morton* v. *Mancari*, 417 U. S. 535, 554–555 (1974).

As the history recited by the majority reveals, the grounds for recognizing the existence of federal trust power here are overwhelming. Shortly before its annexation in 1898, the Republic of Hawaii (installed by United States merchants in a revolution facilitated by the United States Government) expropriated some 1.8 million acres of land that it then ceded to the United States. In the Organic Act establishing the Territory of Hawaii, Congress provided that those lands should remain under the control of the territorial government "until otherwise provided for by Congress," Act of Apr. 30, 1900, ch. 339, § 91, 31 Stat. 159. By 1921, Congress recognized that the influx of foreign infectious diseases, mass immigration coupled with poor housing and sanitation, hunger, and malnutrition had taken their toll. See *ante*, at 506. Confronted with the reality that the Hawaiian people had been "frozen out of their lands and driven into the cities," H. R. Rep. No. 839, 66th Cong., 2d Sess., 4 (1920), Congress decided that 27 specific tracts of the lands ceded in 1898, comprising about 203,500 acres, should be used to provide farms and residences for native Hawaiians. Act of July 9, 1921, ch. 42, 42 Stat. 108. Relying on the precedent of previous federal laws granting Indians special rights in public lands, Congress created the Hawaiian Homes Commission to implement its goal of rehabilitating the native people and culture.[8] Hawaii was required to adopt this Act as a condi-

---

[8] See H. R. Rep. No. 839, 66th Cong., 2d Sess., 4, 11 (1920). Reflecting a compromise between the sponsor of the legislation, who supported special benefits for "all who have Hawaiian blood in their veins," and plantation owners who thought that only "Hawaiians of the pure blood" should qualify, Hawaiian Homes Commission Act: Hearings before the Senate Committee on the Territories, H. R. Rep. No. 13500, 66th Cong., 3d Sess., 14–17 (1920), the statute defined a "native Hawaiian" as "any descendant of not less than one-half part of the blood of the races inhabiting the Hawaiian Islands previous to 1778," 42 Stat. 108.

tion of statehood in the Hawaii Statehood Admissions Act (Admissions Act), § 4, 73 Stat. 5. And in an effort to secure the Government's duty to the indigenous peoples, § 5 of the Admissions Act conveyed 1.2 million acres of land to the State to be held in trust "for the betterment of the conditions of native Hawaiians" and certain other public purposes. § 5(f), *id.*, at 6.

The nature of and motivation for the special relationship between the indigenous peoples and the United States Government was articulated in explicit detail in 1993, when Congress adopted a Joint Resolution containing a formal "apology to Native Hawaiians on behalf of the United States for the overthrow of the Kingdom of Hawaii." 107 Stat. 1510. Among other acknowledgments, the resolution stated that the 1.8 million acres of ceded lands had been obtained "without the consent of or compensation to the Native Hawaiian people of Hawaii or their sovereign government." *Id.*, at 1512.

In the end, however, one need not even rely on this official apology to discern a well-established federal trust relationship with the native Hawaiians. Among the many and varied laws passed by Congress in carrying out its duty to indigenous peoples, more than 150 today expressly include native Hawaiians as part of the class of Native Americans benefited.[9] By classifying native Hawaiians as "Native Americans" for purposes of these statutes, Congress has made clear that native Hawaiians enjoy many of "the same rights and privileges accorded to American Indian, Alaska

---

[9] See Brief for Hawai'i Congressional Delegation as *Amicus Curiae* 7, and App. A; see also, *e. g.*, American Indian Religious Freedom Act, 42 U. S. C. § 1996 *et seq.*; Native American Programs Act of 1974, 42 U. S. C. §§ 2991–2992; Comprehensive Employment and Training Act, 29 U. S. C. § 872; Drug Abuse Prevention, Treatment, and Rehabilitation Act, 21 U. S. C. § 1177; Cranston-Gonzalez National Affordable Housing Act, § 958, 104 Stat. 4422; Indian Health Care Amendments of 1988, 25 U. S. C. § 1601 *et seq.*

Native, Eskimo, and Aleut communities." 42 U. S. C. § 11701(19). See also § 11701(17) ("The authority of the Congress under the United States Constitution to legislate in matters affecting the aboriginal or indigenous peoples of the United States includes the authority to legislate in matters affecting the native peoples of . . . Hawaii").

While splendidly acknowledging this history—specifically including the series of agreements and enactments the history reveals—the majority fails to recognize its import. The descendants of the native Hawaiians share with the descendants of the Native Americans on the mainland or in the Aleutian Islands not only a history of subjugation at the hands of colonial forces, but also a purposefully created and specialized "guardian-ward" relationship with the Government of the United States. It follows that legislation targeting the native Hawaiians must be evaluated according to the same understanding of equal protection that this Court has long applied to the Indians on the continental United States: that "special treatment . . . be tied rationally to the fulfillment of Congress' unique obligation" toward the native peoples. 417 U. S., at 555.

Declining to confront the rather simple logic of the foregoing, the majority would seemingly reject the OHA voting scheme for a pair of different reasons. First, Congress' trust-based power is confined to dealings with tribes, not with individuals, and no tribe or indigenous sovereign entity is found among the native Hawaiians. *Ante*, at 518–520. Second, the elections are "elections of the State," not of a tribe, and upholding this law would be "to permit a State, by racial classification, to fence out whole classes of citizens from decisionmaking in critical state affairs." *Ante*, at 522. In my view, neither of these reasons overcomes the otherwise compelling similarity, fully supported by our precedent, between the once subjugated, indigenous peoples of the continental United States and the peoples of the Hawaiian

Islands whose historical sufferings and status parallel those of the continental Native Americans.

Membership in a tribe, the majority suggests, rather than membership in a race or class of descendants, has been the *sine qua non* of governmental power in the realm of Indian law; *Mancari* itself, the majority contends, makes this proposition clear. *Ante*, at 519–520. But as scholars have often pointed out, tribal membership cannot be seen as the decisive factor in this Court's opinion upholding the BIA preferences in *Mancari;* the hiring preference at issue in that case not only extended to nontribal member Indians, it also required for eligibility that ethnic Native Americans possess a certain quantum of Indian blood.[10] Indeed, the Federal Government simply has not been limited in its special dealings with the native peoples to laws affecting tribes or tribal Indians alone. See nn. 6, 7, *supra*. In light of this precedent, it is a painful irony indeed to conclude that native Hawaiians are not entitled to special benefits designed to restore a measure of native self-governance because they currently lack any vestigial native government—a possibility of which history and the actions of this Nation have deprived them.[11]

---

[10] See, *e. g.*, Frickey, Adjudication and its Discontents: Coherence and Conciliation in Federal Indian Law, 110 Harv. L. Rev. 1754, 1761–1762 (1997). As is aptly explained, the BIA preference in that case was based on a statute that extended the preference to ethnic Indians—identified by blood quantum—who were not members of federally recognized tribes. 25 U. S. C. §479. Only the implementing regulation included a mention of tribal membership, but even that regulation required that the tribal member also "'be one-fourth or more degree Indian blood.'" *Mancari*, 417 U. S., at 553, n. 24.

[11] JUSTICE BREYER suggests that the OHA definition of native Hawaiians (*i. e.*, Hawaiians who may vote under the OHA scheme) is too broad to be "reasonable." *Ante*, at 527 (opinion concurring in result). This suggestion does not identify a constitutional defect. The issue in this case is *Congress'* power to define who counts as an indigenous person, and *Congress'* power to delegate to States its special duty to persons so defined. (JUSTICE BREYER's interest in *tribal* definitions of membership—and in

Of greater concern to the majority is the fact that we are confronted here with a state constitution and legislative enactment—passed by a majority of the entire population of Hawaii—rather than a law passed by Congress or a tribe itself. See, *e. g., ante,* at 519–522. But as our own precedent makes clear, this reality does not alter our analysis. As I have explained, OHA and its trustee elections can hardly be characterized simply as an "affair of the State" alone; they are the instruments for implementing the Fed-

this Court's holding that tribes' power to define membership is at the core of tribal sovereignty and thus "unconstrained by those constitutional provisions framed specifically as limitations on federal or state authority," *Santa Clara Pueblo* v. *Martinez,* 436 U. S. 49, 56 (1978)—is thus inapposite.) Nothing in federal law or in our Indian law jurisprudence suggests that the OHA definition of native is anything but perfectly within that power as delegated. See *supra,* at 531–534, and nn. 6–7. Indeed, the OHA voters match precisely the set of people to whom the congressional apology was targeted.

Federal definitions of "Indian" often rely on the ability to trace one's ancestry to a particular group at a particular time. See, *e. g.,* 25 CFR, ch. 1, § 5.1 (1999) (extending BIA hiring preference to "persons of Indian descent who are . . . (b) [d]escendants of such [tribal] members who were, on June 1, 1934, residing within the present boundaries of any Indian reservation"); see also n. 7, *supra.* It can hardly be correct that once 1934 is two centuries past, rather than merely 66 years past, this classification will cease to be "reasonable." The singular federal statute defining "native" to which JUSTICE BREYER points, 43 U. S. C. § 1602(b) (including those defined by blood quantum without regard to membership in any group), serves to underscore the point that membership in a "tribal" structure *per se,* see *ante,* at 525, is not the acid test for the exercise of federal power in this arena. See R. Clinton, N. Newton, & M. Price, American Indian Law 1054–1058 (3d ed. 1991) (describing provisions of the Alaska Native Claims Settlement Act creating geographic regions of natives with common heritage and interest, 43 U. S. C. § 1606, requiring those regions to organize a native corporation in order to qualify for settlement benefits, § 1607, and establishing the Alaska Native Fund of federal moneys to be distributed to "enrolled natives," §§ 1604–1605); see also *supra,* at 535, and n. 10. In the end, what matters is that the determination of indigenous status or "real group membership," *ante,* at 526 (BREYER, J., concurring in result), is one to be made by Congress—not by this Court.

eral Government's trust relationship with a once sovereign indigenous people. This Court has held more than once that the federal power to pass laws fulfilling the federal trust relationship with the Indians may be delegated to the States. Most significant is our opinion in *Washington* v. *Confederated Bands and Tribes of Yakima Nation*, 439 U. S. 463, 500–501 (1979), in which we upheld against a Fourteenth Amendment challenge a state law assuming jurisdiction over Indian tribes within a State. While we recognized that States generally do not have the same special relationship with Indians that the Federal Government has, we concluded that because the state law was enacted "in response to a federal measure" intended to achieve the result accomplished by the challenged state law, the state law itself need only "'rationally further the purpose identified by the State.'" *Id.*, at 500 (quoting *Massachusetts Bd. of Retirement* v. *Murgia*, 427 U. S. 307, 314 (1976) *(per curiam)*).

The state statutory and constitutional scheme here was without question intended to implement the express desires of the Federal Government. The Admissions Act in § 4 mandated that the provisions of the Hawaiian Homes Commission Act "shall be adopted," with its multiple provisions expressly benefiting native Hawaiians and not others. 73 Stat. 5. More, the Admissions Act required that the proceeds from the lands granted to the State "shall be held by said State as a public trust for . . . the betterment of the conditions of native Hawaiians," and that those proceeds "shall be managed and disposed of . . . in such manner as the constitution and laws of said State may provide, and their use for any other object shall constitute a breach of trust for which suit may be brought by the United States." § 5, *id.*, at 6. The terms of the trust were clear, as was the discretion granted to the State to administer the trust as the State's laws "may provide." And Congress continues to fund OHA on the understanding that it is thereby furthering the federal trust obligation.

The sole remaining question under *Mancari* and *Yakima* is thus whether the State's scheme "rationally further[s] the purpose identified by the State." Under this standard, as with the BIA preferences in *Mancari*, the OHA voting requirement is certainly reasonably designed to promote "self-government" by the descendants of the indigenous Hawaiians, and to make OHA "more responsive to the needs of its constituent groups." *Mancari*, 417 U. S., at 554. The OHA statute provides that the agency is to be held "separate" and "independent of the [State] executive branch," Haw. Rev. Stat. § 10–4 (1993); OHA executes a trust, which, by its very character, must be administered for the benefit of Hawaiians and native Hawaiians, §§ 10–2, 10–3(1), 10–13.5; and OHA is to be governed by a board of trustees that will reflect the interests of the trust's native Hawaiian beneficiaries, Haw. Const., Art. XII, § 5 (1993); Haw. Rev. Stat. § 13D–3(b) (1993). OHA is thus "directed to participation by the governed in the governing agency." *Mancari*, 417 U. S., at 554. In this respect among others, the requirement is "reasonably and directly related to a legitimate, nonracially based goal." *Ibid.*

The foregoing reasons are to me more than sufficient to justify the OHA trust system and trustee election provision under the Fourteenth Amendment.

### III

Although the Fifteenth Amendment tests the OHA scheme by a different measure, it is equally clear to me that the trustee election provision violates neither the letter nor the spirit of that Amendment.[12]

---

[12] Just as one cannot divorce the Indian law context of this case from an analysis of the OHA scheme under the Fourteenth Amendment, neither can one pretend that this law fits simply within our non-Indian cases under the Fifteenth Amendment. As the preceding discussion of *Mancari* and our other Indian law cases reveals, this Court has never understood laws relating to indigenous peoples simply as legal classifications defined by

Section 1 of the Fifteenth Amendment provides:

"The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude." U. S. Const., Amdt. 15.

As the majority itself must tacitly admit, *ante,* at 513–514, the terms of the Amendment itself do not here apply. The OHA voter qualification speaks in terms of ancestry and current residence, not of race or color. OHA trustee voters must be "Hawaiian," meaning "any descendant of the aboriginal peoples inhabiting the Hawaiian Islands which exercised sovereignty and subsisted in the Hawaiian Islands in 1778, and which peoples have thereafter continued to reside in Hawaii." Haw. Rev. Stat. § 10–2 (1993). The ability to vote is a function of the lineal *descent* of a modern-day resident of Hawaii, not the blood-based characteristics of that resident, or of the blood-based proximity of that resident to the "peoples" from whom that descendant arises.

The distinction between ancestry and race is more than simply one of plain language. The ability to trace one's ancestry to a particular progenitor at a single distant point in time may convey no information about one's own apparent or acknowledged race today. Neither does it of necessity imply one's own identification with a particular race, or the exclusion of any others *"on account of race."* The terms manifestly carry distinct meanings, and ancestry was not included by the Framers in the Amendment's prohibitions.

Presumably recognizing this distinction, the majority relies on the fact that "[a]ncestry can be a proxy for race." *Ante,* at 514. That is, of course, true, but it by no means

race. Even where, unlike here, blood quantum requirements are express, this Court has repeatedly acknowledged that an overlapping political interest predominates. It is only by refusing to face this Court's entire body of Indian law, see *ante,* at 511–512, that the majority is able to hold that the OHA qualification denies non-"Hawaiians" the right to vote "on account of race."

follows that ancestry is always a proxy for race. Cases in which ancestry served as such a proxy are dramatically different from this one. For example, the literacy requirement at issue in *Guinn* v. *United States*, 238 U. S. 347 (1915), relied on such a proxy. As part of a series of blatant efforts to exclude blacks from voting, Oklahoma exempted from its literacy requirement people whose ancestors were entitled to vote prior to the enactment of the Fifteenth Amendment. The *Guinn* scheme patently "served only to perpetuate . . . old [racially discriminatory voting] laws and to effect a transparent racial exclusion." *Ante*, at 513. As in *Guinn*, the voting laws held invalid under the Fifteenth Amendment in all of the cases cited by the majority were fairly and properly viewed through a specialized lens—a lens honed in specific detail to reveal the realities of time, place, and history behind the voting restrictions being tested.

That lens not only fails to clarify, it fully obscures the realities of this case, virtually the polar opposite of the Fifteenth Amendment cases on which the Court relies. In *Terry* v. *Adams*, 345 U. S. 461 (1953), for example, the Court held that the Amendment proscribed the Texas "Jaybird primaries" that used neutral voting qualifications "with a single proviso—Negroes are excluded," *id.*, at 469. Similarly, in *Smith* v. *Allwright*, 321 U. S. 649, 664 (1944), it was the blatant "discrimination against Negroes" practiced by a political party that was held to be state action within the meaning of the Amendment. Cases such as these that "strike down these voting systems . . . designed to exclude one racial class (at least) from voting," *ante*, at 513–514, have no application to a system designed to empower politically the remaining members of a class of once sovereign, indigenous people.

Ancestry surely can be a proxy for race, or a pretext for invidious racial discrimination. But it is simply neither proxy nor pretext here. All of the persons who are eligible to vote for the trustees of OHA share two qualifications that no other person old enough to vote possesses: They are bene-

ficiaries of the public trust created by the State and administered by OHA, and they have at least one ancestor who was a resident of Hawaii in 1778. A trust whose terms provide that the trustees shall be elected by a class including beneficiaries is hardly a novel concept. See 2 A. Scott & W. Fratcher, Law of Trusts § 108.3 (4th ed. 1987). The Committee that drafted the voting qualification explained that the trustees here should be elected by the beneficiaries because "people to whom assets belong should have control over them . . . . The election of the board will enhance representative governance and decision-making accountability and, as a result, strengthen the fiduciary relationship between the board member, as trustee, and the native Hawaiian, as beneficiary." [13] The described purpose of this aspect of the classification thus exists wholly apart from race. It is directly focused on promoting both the delegated federal mandate, and the terms of the State's own trustee responsibilities.

The majority makes much of the fact that the OHA trust—which it assumes is legitimate—should be read as principally intended to benefit the smaller class of "native Hawaiians," who are defined as at least one-half descended from a native islander circa 1778, Haw. Rev. Stat. § 10–2 (1993), not the larger class of "Hawaiians," which includes "any descendant" of those aboriginal people who lived in Hawaii in 1778 and "which peoples thereafter have continued to reside in Hawaii," ibid. See ante, at 523. It is, after all, the majority notes, the larger class of Hawaiians that enjoys the suffrage right in OHA elections. There is therefore a mismatch in interest alignment between the trust beneficiaries and the trustee electors, the majority contends, and it thus cannot be said that the class of qualified voters here is defined solely by beneficiary status.

---

[13] 1 Proceedings of the Constitutional Convention of Hawaii of 1978, Standing Committee Rep. No. 59, p. 644.

While that may or may not be true depending upon the construction of the terms of the trust, there is surely nothing racially invidious about a decision to enlarge the class of eligible voters to include "any descendant" of a 1778 resident of the Islands. The broader category of eligible voters serves quite practically to ensure that, regardless how "dilute" the *race* of native Hawaiians becomes—a phenomenon also described in the majority's lavish historical summary, *ante*, at 506–507—there will remain a voting interest whose ancestors were a part of a political, cultural community, and who have inherited through participation and memory the set of traditions the trust seeks to protect. The putative mismatch only underscores the reality that it cannot be purely a racial interest that either the trust or the election provision seeks to secure; the political and cultural interests served are—unlike *racial* survival—shared by both native Hawaiians and Hawaiians.[14]

---

[14] Of course, the majority's concern about the absence of alignment becomes salient only if one assumes that something other than a *Mancari*-like political classification is at stake. As this Court has approached cases involving the relationship among the Federal Government, its delegates, and the indigenous peoples—including countless federal definitions of "classes" of Indians determined by blood quantum, see n. 7, *supra*—any "racial" aspect of the voting qualification here is eclipsed by the political significance of membership in a once-sovereign indigenous class.

Beyond even this, the majority's own historical account makes clear that the inhabitants of the Hawaiian Islands whose descendants constitute the instant class are identified and remain significant as much because of culture as because of race. By the time of Cook's arrival, "the Hawaiian people had developed, over the preceding 1,000 years or so, a cultural and political structure . . . well-established traditions and customs and . . . a polytheistic religion." *Ante*, at 500. Prior to 1778, although there "was no private ownership of land," *Hawaii Housing Authority* v. *Midkiff*, 467 U. S. 229, 232 (1984), the native Hawaiians "lived in a highly organized, self-sufficient, subsistence social system based on communal land tenure with a sophisticated language, culture, and religion," 42 U. S. C. § 11701(4). According to Senator Akaka, their society "was steeped in science [and they] honored their *'aina* (land) and environment, and therefore developed methods of irrigation, agriculture, aquaculture, navigation,

Even if one refuses to recognize the beneficiary status of OHA trustee voters entirely,[15] it cannot be said that the ancestry-based voting qualification here simply stands in the

medicine, fishing and other forms of subsistence whereby the land and sea were efficiently used without waste or damage. Respect for the environment and for others formed the basis of their culture and tradition." App. E to Brief for Hawai'i Congressional Delegation as *Amicus Curiae* E–4. Legends and oral histories passed from one generation to another are reflected in artifacts such as carved images, colorful feathered capes, songs, and dances that survive today. For some, Pele, the God of Fire, still inhabits the crater of Kilauea, and the word of the Kahuna is still law. It is this culture, rather than the Polynesian race, that is uniquely Hawaiian and in need of protection.

[15] JUSTICE BREYER's even broader contention that "there is no 'trust' for native Hawaiians here," *ante*, at 525, appears to make the greater mistake of conflating the public trust established by Hawaii's Constitution and laws, see *supra*, at 537, with the "trust" relationship between the Federal Government and the indigenous peoples. According to JUSTICE BREYER, the "analogy on which Hawaii's justification must depend," *ante*, at 527, is "destroy[ed]" in part by the fact that OHA is not a trust (in the former sense of a trust) for native Hawaiians alone. Rather than looking to the terms of the public trust itself for this proposition, JUSTICE BREYER relies on the terms of the land conveyance to Hawaii in part of the Admissions Act. But the portion of the trust administered by OHA does not purport to contain in its corpus all 1.2 million acres of federal trust lands set aside for the benefit of all Hawaiians, including native Hawaiians. By its terms, only "[t]wenty per cent of all revenue derived from the public land trust shall be expended by the office for the betterment of the conditions of native Hawaiians." Haw. Rev. Stat. §10–13.5 (1993). This portion appears to coincide precisely with the one-fifth described purpose of the Admissions Act trust lands to better the conditions of native Hawaiians. Admissions Act §5(f), 73 Stat. 6. Neither the fact that native Hawaiians have a specific, beneficial interest in only 20% of trust revenues, nor the fact that the portion of the trust administered by OHA is supplemented to varying degrees by nontrust moneys, negates the existence of the trust itself.

Moreover, neither the particular terms of the State's public trust nor the particular source of OHA funding "destroys" the centrally relevant trust "analogy" on which Hawaii relies—that of the relationship between the Federal Government and indigenous Indians on this continent, as compared with the relationship between the Federal Government and indige-

shoes of a classification that would either privilege or penalize "on account of" race. The OHA voting qualification—part of a statutory scheme put in place by democratic vote of a multiracial majority of all state citizens, including those non-"Hawaiians" who are not entitled to vote in OHA trustee elections—appropriately includes every resident of Hawaii having at least one ancestor who lived in the islands in 1778. That is, among other things, the audience to whom the congressional apology was addressed. Unlike a class including only full-blooded Polynesians—as one would imagine were the class strictly defined in terms of race—the OHA election provision *excludes* all full-blooded Polynesians currently residing in Hawaii who are not descended from a 1778 resident of Hawaii. Conversely, unlike many of the old southern voting schemes in which any potential voter with a "taint" of non-Hawaiian blood would be excluded, the OHA scheme excludes no descendant of a 1778 resident because he or she is also part European, Asian, or African as a matter of race. The classification here is thus both too inclusive and not inclusive enough to fall strictly along racial lines.

At pains then to identify at work here a singularly "racial purpose," *ante,* at 515, 517—whatever that might mean, although one might assume the phrase a "proxy" for "racial discrimination"—the majority next posits that "[o]ne of the principal reasons race is treated as a forbidden classification is that it demeans the dignity and worth of a person to be judged by ancestry instead of by his or her own merit and essential qualities." *Ante,* at 517. That is, of course, true when ancestry is the basis for denying or abridging one's right to vote or to share the blessings of freedom. But it is quite wrong to ignore the relevance of ancestry to claims of

_____

nous Hawaiians in the now United States-owned Hawaiian Islands. That trust relationship—the only trust relevant to the Indian law analogy—includes the power to delegate authority to the States. As we have explained, *supra,* at 531–534, the OHA scheme surely satisfies the established standard for testing an exercise of that power.

an interest in trust property, or to a shared interest in a proud heritage.  There would be nothing demeaning in a law that established a trust to manage Monticello and provided that the descendants of Thomas Jefferson should elect the trustees.  Such a law would be equally benign, regardless of whether those descendants happened to be members of the same race.[16]

In this light, it is easy to understand why the classification here is not "demeaning" at all, *ante,* at 523, for it is simply not based on the "premise that citizens of a particular race are somehow more qualified than others to vote on certain matters," *ibid.*  It is based on the permissible assumption in this context that families with "any" ancestor who lived in Hawaii in 1778, and whose ancestors thereafter continued to live in Hawaii, have a claim to compensation and self-determination that others do not.  For the multiracial majority of the citizens of the State of Hawaii to recognize that deep reality is not to demean their own interests but to honor those of others.

It thus becomes clear why the majority is likewise wrong to conclude that the OHA voting scheme is likely to "become the instrument for generating the prejudice and hostility all too often directed against persons whose particular ancestry

---

[16] Indeed, "[i]n one form or another, the right to pass on property—to one's family in particular—has been part of the Anglo-American legal system since feudal times." *Hodel* v. *Irving,* 481 U. S. 704, 716 (1987).  Even the most minute fractional interests that can be identified after allotted lands are passed through several generations can receive legal recognition and protection.  Thus, we held not long ago that inherited shares of parcels allotted to the Sioux in 1889 could not be taken without compensation even though their value was nominal and it was necessary to use a common denominator of 3,394,923,840,000 to identify the size of the smallest interest.  *Id.,* at 713–717.  Whether it is wise to provide recompense for all of the descendants of an injured class after several generations have come and gone is a matter of policy, but the fact that their interests were acquired by inheritance rather than by assignment surely has no constitutional significance.

is disclosed by their ethnic characteristics and cultural tradi-
tions." *Ante*, at 517. The political and cultural concerns
that motivated the nonnative majority of Hawaiian voters to
establish OHA reflected an interest in preserving through
the self-determination of a particular people ancient tradi-
tions that they value. The fact that the voting qualification
was established by the entire electorate in the State—the
vast majority of which is not native Hawaiian—testifies to
their judgment concerning the Court's fear of "prejudice and
hostility" against the majority of state residents who are not
"Hawaiian," such as petitioner. Our traditional understand-
ing of democracy and voting preferences makes it difficult to
conceive that the majority of the State's voting population
would have enacted a measure that discriminates against, or
in any way represents prejudice and hostility toward, that
self-same majority. Indeed, the best insurance against that
danger is that the electorate here retains the power to revise
its laws.

## IV

The Court today ignores the overwhelming differences be-
tween the Fifteenth Amendment case law on which it relies
and the unique history of the State of Hawaii. The former
recalls an age of abject discrimination against an insular
minority in the old South; the latter at long last yielded the
"political consensus" the majority claims it seeks, *ante*, at
524—a consensus determined to recognize the special claim
to self-determination of the indigenous peoples of Hawaii.
This was the considered and correct view of the District
Judge for the United States District Court for the District
of Hawaii, as well as the three Circuit Judges on the Court
of Appeals for the Ninth Circuit.[17]  As Judge Rymer
explained:

---

[17] Indeed, the record indicates that none of the 20-plus judges on the
Ninth Circuit to whom the petition for rehearing en banc was circulated
even requested a vote on the petition. App. to Pet. for Cert. 44a.

"The special election for trustees is not equivalent to a general election, and the vote is not for officials who will perform general governmental functions in either a representative or executive capacity. . . . Nor does the limitation in these circumstances suggest that voting eligibility was designed to exclude persons who would otherwise be interested in OHA's affairs. . . . Rather, it reflects the fact that the trustees' fiduciary responsibilities run only to native Hawaiians and Hawaiians and 'a board of trustees chosen from among those who are interested parties would be the best way to insure proper management and adherence to the needed fiduciary principles.'[18]  The challenged part of Hawaii law was not contrived to keep non-Hawaiians from voting in general, or in any respect pertinent to their legal interests.  Therefore, we cannot say that [petitioner's] right to vote has been denied or abridged in violation of the Fifteenth Amendment.

[18] 1 Proceedings of the Constitutional Convention of Hawaii of 1978, Standing Comm. Rep. No. 59 at 644.  The Committee reporting on Section 5, establishing OHA, further noted that trustees should be so elected because 'people to whom assets belong should have control over them. . . . The election of the board will enhance representative governance and decision-making accountability and, as a result, strengthen the fiduciary relationship between the board member, as trustee, and the native Hawaiian, as beneficiary.'  *Id.*"

146 F. 3d 1075, 1081–1082 (CA9 1998).

In my judgment, her reasoning is far more persuasive than the wooden approach adopted by the Court today.

Accordingly, I respectfully dissent.

JUSTICE GINSBURG, dissenting.

I dissent essentially for the reasons stated by JUSTICE STEVENS in Part II of his dissenting opinion.  *Ante*, at 529–538 (relying on established federal authority over Native

Americans). Congress' prerogative to enter into special trust relationships with indigenous peoples, *Morton* v. *Mancari*, 417 U. S. 535 (1974), as JUSTICE STEVENS cogently explains, is not confined to tribal Indians. In particular, it encompasses native Hawaiians, whom Congress has in numerous statutes reasonably treated as qualifying for the special status long recognized for other once-sovereign indigenous peoples. See *ante*, at 533–534, and n. 9 (STEVENS, J., dissenting). That federal trust responsibility, both the Court and JUSTICE STEVENS recognize, has been delegated by Congress to the State of Hawaii. Both the Office of Hawaiian Affairs and the voting scheme here at issue are "tied rationally to the fulfillment" of that obligation. See *Mancari*, 417 U. S., at 555. No more is needed to demonstrate the validity of the Office and the voting provision under the Fourteenth and Fifteenth Amendments.