# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 99-2282EA

_____

| | | |
|---|---|---|
| Willie Taylor; Derrick Marshall; | * | |
| Latesa Calloway; Mary Darlen Holmes; | * | |
| Lasaundra Johnson; Loretta Page; | * | |
| Alice Calloway; Stanley Calloway; | * | |
| Bernice Bates; Nikita Calloway; | * | |
| Ruby Coburn; Arnissa Edwards; | * | |
| William Gollin; Grace Page; | * | |
| Kimberly Nathan Warren; and | * | |
| Sharon White, | * | |
| | * | |
| Appellants, | * | |
| | * | |
| v. | * | On Appeal from the United |
| | * | States District Court |
| | * | for the Eastern District |
| William Howe; Mary Freeman; | * | of Arkansas. |
| Dixie Carlson, Individually and in | * | |
| Their Official Capacities as Poll | * | |
| Workers; Ruth Trent, in Her Official | * | |
| Capacity as County Clerk for | * | |
| Crittenden County; Lindsey Fairley; | * | |
| Thomas Graham; Nolan Dawson, | * | |
| Individually and in Their Official | * | |
| Capacities as the Members of the | * | |
| Crittenden County Board of Election | * | |
| Commissioners; and Johnny Rogers, | * | |
| in His Individual Capacity, | * | |
| | * | |
| Appellees. | * | |

_____

Submitted: February 14, 2000
Filed: August 31, 2000
_____

Before RICHARD S. ARNOLD, HEANEY, and LOKEN, Circuit Judges.
_____

RICHARD S. ARNOLD, Circuit Judge.


This is an action under 42 U.S.C. § 1983 arising out of the election difficulties of black citizens in Crittenden County, Arkansas, who attempted to vote, ran for local office, or served as poll watchers for black candidates. The claims all arise out of the election for municipal offices in the small city of Crawfordsville, Arkansas, on November 5, 1996. Sixteen black citizens filed suit against three poll workers, the Crittenden County Clerk, the three members of the Crittenden County Board of Election Commissioners, and a poll watcher. The plaintiffs' substantive claims are based on 42 U.S.C. § 1971(a)(1), (a)(2)(A), and (a)(2)(B); the Fourteenth and Fifteenth Amendments to the United States Constitution, and 42 U.S.C. § 1973(a), (b). The District Court, following a three-day bench trial, found that the plaintiffs failed to establish any intentional discrimination (the gist of the plaintiffs' position), ruled in favor of the defendants, and dismissed the complaint with prejudice. The plaintiffs argue that the District Court made erroneous findings of fact and law, and that the Court failed to appreciate evidence of discriminatory intent. Upon review for clear error of the District Court's finding of a lack of intentional discrimination by any defendants against any plaintiffs, we affirm in many respects. With respect to some of the individual voters' claims for damages, however, we have a definite and firm conviction that the Court's findings were mistaken. As to those claims, we reverse and remand for a determination of damages.

## I.  Background

Crawfordsville, Arkansas, is a small city in Crittenden County, in the Mississippi River delta region of Eastern Arkansas.  Crawfordsville is .41 square miles in size and is bisected by a railroad track that runs east to west through the City, dividing the black and white communities.  Tr. 30.  There are only twelve streets in Crawfordsville.  Residents south of the tracks are all black, Tr. 278-79, and residents north of the railroad tracks are primarily white.  Tr. 277.  The City of Crawfordsville and the area of the County surrounding the City make up the Jackson 1 voting precinct.  Tr. 560.  The majority of the City's population consists of black citizens.  The 1990 Census reported that 617 persons lived in Crawfordsville, with 405 being black citizens.  Tr. 30-31.  However, no black citizen held a Crawfordsville City government position until 1990.  Tr. 280.  In 1990, four black citizens were elected to four of the five Crawfordsville City Council positions.  The fifth City Council position, as well as the City Recorder and City Treasurer positions, were held by white people.  The Mayor during that term, William Howe, is Asian.  He served as Mayor of Crawfordsville from 1977 to 1993.  Mr. Howe is a defendant in this case.

In 1992, five black citizens filed petitions for candidacy in the race for the City Council positions, and five white citizens filed opposing candidacies for the same positions.  Because the white candidates filed by wards at a time when the City had not yet set up a ward plan, the white candidates were disqualified by court order, leaving the five black candidates unopposed in the 1992 election.  The five black candidates for City Council, as well as black candidates running for the offices of City Recorder and City Treasurer, won.  Tr. 282-83.  The candidate defeated in the 1992 election for City Recorder was Mary Freeman, a white woman, also a defendant in this case.  William Howe was again elected Mayor, but he resigned in March of 1993, for reasons of health, during the term of the majority-black City administration.  During the time that all Council members were black, legal battles between the black City Administration and certain white citizens occurred.  White citizens, including Mr.

Howe, filed a Freedom of Information Act request for documents held by the majority-black city government, and sued the City and all of its officials. Tr. 285-86. A state court ordered access to the records. After receiving the documents, the white citizens then sought prosecution of the City Councilmen for misuse of funds; however, the Prosecuting Attorney found no basis for prosecution. Thereafter, the City filed three lawsuits. A defendant in one of the cases was Mary Freeman, and a defendant in one of the other cases was William Howe.

In 1994, the number of City Council positions was increased to six. After the 1994 election, the City Council shifted from being black to being predominantly white. White candidates defeated black candidates in all five City Council races where a black candidate faced a white candidate. Loretta Page, a black woman, ran unopposed and was seated in the sixth City Council position. Tr. 284. The new, primarily white, City administration settled the lawsuits filed by the previous, primarily black, administration, on terms favorable to the defendants. Tr. 288.

Ruth Trent is the County Clerk of Crittenden County. She is one of the defendants in this case. Voter-registration records are maintained in the County Clerk's Office. During the time prior to the November 5, 1996, election, it was the practice of the County Clerk's Office to send one precinct register to the Jackson 1 precinct polling place, and that register included the names of both city and county voters in the precinct. Tr. 560. Thus, both county and city residents of the Jackson 1 precinct voted from the same register at the same polling place. Tr. 561. At that time, there were two voting machines at the one polling place. One machine was programmed for the county ballot, and one machine was programmed for the city ballot. The city ballot included more races than the county ballot (those for city offices). The determination of which voters voted what ballot was made on election day. Tr. 561. County Clerk Ruth Trent testified that on election day, "the judges and clerks and the person I guess going in to vote, you know, determined where they went, you know, which ballot they would give

-4-

them." Tr. 560. Determining whether a person voted a city or county ballot "was done between the clerk and the voter." Tr. 562.

In the summer of 1996, the County Clerk's Office began to separate all of the Crittenden County precinct registers into city boxes or county boxes, pursuant to a new state law requiring such separation. Tr. 565, 571. Ms. Trent made extensive efforts to obtain accurate addresses for each registered voter, but the process was difficult. The Clerk's Office had only four employees. Contacts with post offices in Crittenden County produced no response. Ms. Trent got in touch with both black and white individual citizens. In addition, she got some addresses from the Crawfordsville Water Department, where the defendant Mary Freeman worked. A major problem was that many voters listed their address as a post office box, so it was not possible to determine their street address, the key fact governing whether they were eligible to vote in the City. If accurate information could not be obtained, Ms. Trent would just leave a particular voter in the County. In addition, voter cards were sent out to each individual voter, with an invitation to correct any wrongly recorded addresses. These efforts, though extensive, were not altogether successful. For one thing, a computer operator in the Clerk's Office failed to put 46 voters who had city addresses into the City register. The error occurred when the computer operator failed to check a certain box in the computer program.

A word needs to be said at this point about how elections are conducted in Arkansas. There is in each county a County Board of Election Commissioners. The Election Commissioners in Crittenden County in 1996, all defendants in this action, were Nolan Dawson, Lindsey Fairley, and Thomas Graham. Nolan Dawson, who has since died, was black. Lindsey Fairley and Thomas Graham are both white. One member of each County Board of Election Commissioners is Chairman of the Democratic Central Committee for that county, or his designee, and a second member is the Chairman of the Republican Central Committee for that county, or his designee. Mr. Dawson was the Democratic member of the Board in 1996, and Mr. Graham was

the Republican member. The third member, Mr. Fairley, was chosen by the State Board of Election Commissioners. By statute, the third member must be a member of the "majority party," which is defined as that political party to which a majority of the State Board of Election Commissioners belongs. In 1996, the majority party was the Democratic Party. The State Board of Election Commissioners is composed of all constitutional officers elected statewide, including the Governor, Lieutenant Governor, the Secretary of State, the Attorney General, the State Treasurer, the Auditor of State, and the State Land Commissioner. In 1996, a majority of these officials (all but the Governor and the Lieutenant Governor) were Democrats. Mr. Fairley is a Democrat. Mr. Dawson served as Chairman of the County Board of Election Commissioners.

The Election Commission in each county is charged by statute with various duties: establishing polling places, conducting drawings of candidates for ballot positions, assuring that ballots or voting machines are properly prepared or programmed, receiving the tally of votes after the election, certifying the election results, and sending the results to the office of the Secretary of State or the County Clerk's Office. The County paid for the general election in 1996 and also allocated a budget for the Election Commission. The Election Commission and the County Clerk are two separate entities, with neither having supervisory power over the other.

Another principal task of the Election Commission is to select people to work at the polls. The County Clerk's Office plays no role in the selection of poll workers. Tr. 593. The Clerk's Office pays poll workers a small salary for their services on election day. Tr. 594. In the selection of poll workers, the majority party is entitled to two judges and one clerk, the minority party is entitled to one judge and one clerk, and one officer of the day (sometimes called "the sheriff of the box") is appointed to keep the peace at the polling place. Tr. 631. It has been difficult to get people to work the polls, and sometimes designated poll workers fail to show up on election day to work. Tr. 686-87. For the November 5, 1996, election, Ms. Freeman (a white woman) and Carla James (a black woman) were appointed as election clerks, Dixie Carlson (a

white woman) and Lisa Washington (a black woman) were appointed as election judges, Ranny Shortnacy (a white man) was appointed as sheriff of the day, and William Howe (an Asian man) was designated as an alternate. Ms. Washington, not being a registered voter, failed to qualify, and Mr. Howe served in her place.

A poll watcher (to be distinguished from poll workers, who are appointed by the Board of Election Commissioners, a public body) was also present at the City polling place on November 5, 1996. Poll watchers are appointed by candidates. Their job is to watch the voting and call the attention of the election officials at the particular box to any irregularities they perceive. Johnny Rogers, a poll watcher named by a candidate for Congress, was present at the Crawfordsville City polling place in 1996, and is a named defendant in this action.

The Election Commissioners conducted poll-worker training seminars for prospective poll workers. The Commissioners used a "Poll Worker Training Workbook," which was distributed by the Secretary of State's office, to conduct the training. Tr. 629. William Howe, Mary Freeman, and Dixie Carlson were trained as poll workers for the November 5, 1996, general election. Carla James, a black woman, could not attend a training session because of an illness in her family. Tr. 181.

The Secretary of State sent voting procedures to poll worker trainees. The standard procedure was for a voter to enter the poll and identify himself to the election judge by giving his name, address, and date of birth. The election judge then locates the voter's name on the Precinct Voter Registration List ("register") to see if the name, address, and date of birth match; the voter signs the Precinct Registration List and List of Voters; the voter is given instructions on how to vote; and then the voter is allowed to vote. App. 2 at 24. The training materials also covered the following:

*What is "fail-safe" voting?*

"Fail-safe" voting is the mechanism that allows voters who have not updated their voter registration information to vote at their new precinct without having updated their voter registration records.

*What if a voter is non-registered or improperly registered?*

1.     If the **date of birth** given by the voter is not the same as that on the "Precinct Voter Registration List", then the judge may request the voter to provide additional identification as the judge deems appropriate.

2.     If the **address** given by the voter is not the same as that on the "Precinct Voter Registration List", then the judge should verify with the county clerk that the address given by the voter is within the voting precinct.

> If the address **is** within the precinct, then the voter must complete a "Voter Registration Application" to change addresses for county records.  Then, the voter is allowed to vote.

> If the address **is not** within the precinct, then the judge should instruct the voter to contact the county clerk to determine the proper voting precinct.  Then, the voter should be instructed to go to the proper polling place to vote.

3.     If the voter's **name** is not on the "Precinct Voter Registration List", the judge shall permit the voter to vote under the following conditions:

> Voter identifies himself by name and date of birth and is verified by the county clerk as a registered voter within the county

> Voter gives and affirms his current residence and the election judge verifies with the county clerk that the residence is within the voting precinct

Voter completes an updated voter registration application form

Voter signs "Precinct Voter Registration List" and "List of Voters" form

4.      If the voter's **name** is not on the list and the county clerk is unable to verify the voter's registration and the voter contends that he/she is eligible to vote, then the voter may vote a challenged ballot.  *In this instance, the poll __worker__ is responsible for challenging the ballot.*

App. 2 at 22.  The training materials also provided emergency phone numbers for poll workers to call if a problem arose during the election, such as the County Clerk's Office number, "if you need information concerning a voter's registration or place of residence, if you need more ballot or stub boxes, or if you need more voter application or change of address forms."  App. 2 at 20.

Moreover, the training materials asked participants, "Who can assist a person with a disability casting a ballot?"  The correct answer is, "Anyone the person wants." App. 2 at 8.  And the materials asked participants, "If a person with disabilities asks a poll worker for assistance, who can help?"  The correct answer is, "Two judges." App. 2 at 8.  Ms. Freeman acknowledged at trial that the training session informed training participants that a voter with a disability could be assisted in voting by "[a]nyone the voter wants," but if a voter with a disability asks a poll worker for assistance, two judges can provide assistance to the voter.  Tr. 379-80.

There was a procedure whereby voters could vote by absentee ballot.  When an absentee ballot was requested from the Clerk's Office, the Clerk's Office stamped the precinct binder with the word "absentee" next to the person's name at the time the absentee ballot was mailed to the voter.  Tr. 576-77.  If a voter did not return a completed ballot, the words "absentee" remained stamped by his name.

Early voting was available to voters for two weeks before the election. People voting early would sign the same precinct register that would be sent to the polling place on election day. Tr. 583. During early voting, Clerk's Office employees tried to correct what errors they could in the precinct books, such as voters' names' being listed in the wrong register – the Clerk's Office noticed that some County residents were listed in the city register; therefore, these people were given a county ballot instead of a city ballot. Tr. 604-05. Ms. Trent, the County Clerk, testified that a procedure was in place on November 5, 1996, whereby similar corrections could be made for people who were listed in the wrong register, "if they could get through to us [on the telephone at the Clerk's Office]." Tr. 605.

For the November 5, 1996, general election, Crawfordsville city residents were to vote at the City Water Department office ("City polling place"), and residents living outside the City were to vote at the City library ("County polling place"). The library is across Main Street from the Water Department office. The city ballot at the City polling place included the Crawfordsville City government positions, whereas the county ballot at the County polling place did not. A list of county voters was sent to the County polling place, and a list of city voters was sent to the City polling place. One black candidate and one white candidate ran for City office.

On November 5, 1996, when a voter approached the Clerks' table on election day, a determination would be made whether the voter was at the correct voting precinct, the voter would sign in, each clerk would sign a list, and then the voter would go into the voting booth and vote on the machine. Tr. 715-16.

Ms. James testified that the County Clerk's Office informed the poll workers on the morning of November 5, 1996, that the Clerk's Office "had made a lot of omissions from the book. A lot of names had been omitted." Tr. 189. Ms. Carlson testified that during election day "the county was sending people to us, and we were sending people [both black and white] over there. If there was not a decision made, then we would call

-10-

the office, or if we would think they lived in the city, they would vote in the city." Tr. 730-31. Applications for voters to change their address prior to voting were sent to the polling places on November 5, 1996. Tr. 599-600. There is no evidence in the record that these applications were used on November 5, 1996, or that any poll worker suggested that a voter fill out an application to change his address at the City polling place.

Commissioner Fairley informed those people present in the City polling place that "handicapped voters were entitled to be assisted by a person of their choice, and candidates were allowed to be present within the polling place by a poll watcher or personally, as long as they did not interfere with the election process. . . ." Tr. 645-46. Commissioner Fairley testified, "It is hard to get judges and clerks to understand that voters can be assisted by anyone they want to assist them. . . . It had been part of the training. But sometimes training doesn't take." Tr. 646. Fairley added, "We have that issue come up in every election. Some judge or clerk thinks that they ought to be able to determine who is the assister for some voter or group of voters." Tr. 660.

Two hundred and fifty-one people voted on the voting machine at the City polling place. The number of black voters was between 67 and 85. Twelve voters were issued paper ballots, and Ms. Carlson wrote the names of 11 of these 12 voters on a list of challenged voters. Tr. 137, 592. All 11 people listed on the list of challenged voters are black citizens. The race of the person casting the twelfth paper ballot is unknown. Ms. James knew all 11 of the challenged voters by name. Tr. 137. Ms. James testified that Ms. Freeman, mainly, or Ms. Carlson would state the reason why a person could not vote, Ms. Carlson would write the voter's name on the challenged voter list, and the challenged voter was then required to vote on a paper ballot instead of the voting machine. Tr. at 137-38. Although Ms. James affirmed that some challenged voters lived in the City, her affirmation was largely disregarded by other poll workers. After a heated discussion regarding Stanley Calloway's inability to vote, which included Commissioner Dawson, the election officials decided to turn

-11-

on the Water Department video camera and tape events of the election. Tr. 705-06. The tape is in the record before us, and portions of it were played at trial.

Commissioner Fairley testified that challenged ballots are not typical, adding, "We rarely have a challenged ballot in an election in Crittenden County." Tr. 649. He added, "Eleven challenged ballots out of 5,000 [the total number of the votes cast in the whole of Crittenden County] per election is not typical." Commissioner Graham agreed with Mr. Fairley. Tr. 684.

Ms. Freeman testified by deposition that she could not recall any white persons who had difficulty voting on November 5, 1996. Tr. 529-30. Election officials did not allow any black person whose name was on the county list and not on the city list to vote by voting machine, even if the voter stated that he lived in the City. Tr. 370.

After the polls closed, the votes were counted, and, in each of the City races, the white candidate defeated the black candidate. The margin of victory was sufficiently large to make the 11 challenged votes irrelevant, so far as the result of any election was concerned. The Board of Election Commissioners certified the results as reported. The vote was two to one. Commissioner Dawson voted not to certify the results, stating that irregularities had occurred. The other two Commissioners, however, determined that, because the number of challenged ballots did not affect the outcome of the election, they would certify the results with a notation that challenged ballots existed.

Commissioners Fairley and Graham decided not to count the challenged ballots. In Commissioner Fairley's opinion, state law required that they not be counted, because they could not change the result of any race. Tr. 637. The results as certified by the County Board of Election Commissioners were then transmitted to the Secretary of State's office, or to the County Clerk, as appropriate. The black candidates presented the Election Commission with a two-page list of grievances, but the Commission determined that it had no authority to decide whether these grievances were well taken.

The Commission took the position that its only job was to count votes. If votes were cast improperly, or citizens were improperly prevented from voting, the remedy would be an election contest filed in court.

After the election, Ms. Trent, the County Clerk, continued her efforts to correct errors in the voter lists, including particularly the list of voters for the City of Crawfordsville. She sent everyone in Crawfordsville who had a P.O. box number a card, and asked each of them to provide a street address and state whether he or she lived in the City or the County. Half of the voters to whom such cards were sent responded. In addition, after the election, everyone in Crittenden County was given a house number and street address, known as a "911 address." This information was available to the Clerk for her records. Ms. Trent discovered that 46 people listed in the County register in fact had City addresses, and, therefore, should have been placed in the City register. Of these 46 people, however, only two had attempted to vote in the November 5, 1996, election.

## II.  Individual Voters' Claims for Damages

As we have noted, the plaintiffs in this case are 16 black citizens of Crittenden County, all registered voters. The principal defendants are three poll workers, Dixie Carlson, Mary Freeman, and William Howe. These defendants were sued individually and in their official capacities for allegedly discriminating against black citizens on the basis of their race, and intimidating them during the election. The defendant Johnny Rogers, a poll watcher, was sued in his individual capacity, and was charged with discriminating against black voters. The defendant Ruth Trent, the County Clerk, was sued in her official capacity. The complaint alleged that her preparation of the precinct register discriminated against black voters and amounted to a policy of Crittenden County. The three Election Commissioners, Messrs. Fairley, Graham, and Dawson, were sued individually and in their official capacities. The complaint alleged that they discriminated in their decisions regarding the challenged ballots, and their actions

-13-

regarding the complaints made by black candidates. In their prayer for relief, the plaintiffs sought damages for each individual voter who had been allegedly harassed or hindered at the polling place, and also injunctive relief, including a request that the same election officials not be used in future elections, that the Attorney General of the United States make federal observers available for future elections, and that a plan be implemented to ensure that City voter rolls would be limited in the future to persons who lived within the City of Crawfordsville. Costs and reasonable attorneys' fees were also requested.

The facts are complicated and involved, and the record is voluminous. We have carefully read the entire transcript. We believe the case can be best understood if we first set forth the facts relevant to the claim of each individual plaintiff. These claims can be divided into several segments: plaintiffs who were not allowed to vote; plaintiffs whose votes were challenged, and who therefore voted by paper ballot, instead of on the machine; plaintiffs who were denied assistance from persons of their choice; voters who were harassed in other ways; black candidates for City offices who were allegedly harassed at the polls; and black poll watchers who were allegedly harassed at the polls. In each instance, we will set forth the relevant facts and our conclusions.

The core issue in this case is whether any defendant intentionally discriminated on the basis of race against any plaintiff. This is a quintessential question of fact. In each instance, the question turns mainly on conflicting oral testimony and an assessment of its credibility. In these circumstances, our power of review is particularly narrow. Rule 52(a) admonishes us to give "due regard" to the opportunity of the trial court to observe the witnesses and their demeanor. In addition, the Supreme Court has stressed that findings based on credibility, where testimony is internally consistent and not contradicted by physical facts or documentary evidence, and where the witnesses believed by the trier of fact were "plausible," must almost always be affirmed. Anderson v. City of Bessemer City, 470 U.S. 564, 575 (1985). Still, even

-14-

in such a case, findings are not immune from review.  It is our duty to inspect the record searchingly, and, in the end, to reverse if we have "a definite and firm conviction" that any finding of fact was mistaken.  United States v. United States Gypsum Co., 333 U.S. 364, 395, 396 (1948).

## A.  Plaintiffs Who Did Not Vote

### 1.  William Gollin

William Gollin has lived in Crawfordsville since 1965, and he became a registered voter that same year.  Tr. 113, 115.  He completed school up to the third grade.  Tr. 113.  Mr. Gollin asked Loretta Page to assist him in voting because he could not read; however, Mr. Gollin was not permitted to vote because it was alleged that his name was not listed on the precinct register of voters.  Tr. 314.  In fact, Mr. Gollin's name was on the register; however, it was incorrectly spelled – "Gallin" instead of "Gollin."  Tr. 115.  The register correctly provided Mr. Gollin's age, but the address listed was slightly incorrect – 412 South Main instead of 415 South Main.  Tr. 116.  The name "Gallin, William Tell" was listed in the city precinct register only four entries above the entry where his name should have been located (where there was an entry for someone named "Gollins") and on the same page in the register.  App. 2 at 22.

Mr. Gollin testified that he was in the city polling place for fifteen or twenty minutes, the time he testified that it took for the poll workers to determine that he could not vote.  Tr. 125.  Mr. Gollin testified that Carla James and Loretta Page informed the other poll workers that the listing under "Gallin" was really Mr. Gollin's name.  Tr. 118-19, 126-27.  Mr. Gollin also testified that Mr. Howe informed the other election workers that Mr. Gollin did not have running water and that the name "Gallin" was not Mr. Gollin's name.  Tr. 118, 121, 126-27.  Ms. Freeman informed Mr. Gollin that he could not vote because he "didn't have water."  Tr. 120.  Mr. Gollin was a weekly shopper in Mr. Howe's store, when Mr. Howe owned one, and Mr. Howe had been to

Mr. Gollin's home. Tr. 114, 128. However, Mr. Howe testified that he was not asked about whether to challenge Mr. Gollin or not, and testified that throughout the day he never volunteered anything, but only observed the clerks' handling of voter sign-ins. Tr. 787-88. Mr. Gollin did not see anyone make a phone call, and he was not handed a paper ballot so he could cast a vote. Tr. 121. Ms. Carlson testified that she could not recall why Mr. Gollin did not vote a challenged ballot. Tr. 728. Ms. Freeman testified that she seemed to remember Mr. Gollin's coming into the polling place, and to the best of her knowledge she believed that he had already left the polling place when the spelling error was discovered. Tr. 772-73.

Before assessing the particulars of Mr. Gollin's situation, we make a few general observations about the context in which the voting difficulties shown in this record occurred. The political history of Crittenden County, to which the District Court gave little or no weight, is important. There has been a "long history of racial discrimination in the electoral process in Arkansas." Harvell v. Blytheville School District, 71 F.3d 1382, 1390 (8th Cir. 1995); Perkins v. City of West Helena, 675 F.2d 201, 211 (8th Cir.), aff'd mem., 459 U.S. 801 (1982). The history of polarized voting and racial discrimination in Crittenden County has been particularly noted. See Smith v. Clinton, 687 F. Supp. 1310, remedial order entered, 687 F. Supp. 1361 (E.D. Ark.) (three-judge Court), aff'd mem., 488 U.S. 988 (1988). "The hangover from this history of racial discrimination necessarily inhibits full participation in the political process." 687 F. Supp. at 1317. The race for City offices on November 5, 1996, is a good example. There was one white candidate and one black candidate for almost every contested position. We think it fair to infer that most (though not all) black voters favored black candidates, and that most (but not all) white voters favored white candidates. All but one of the election officials at the City polling place were white. The voters who experienced problems that day were overwhelmingly black. Between 67 and 81 black voters cast ballots, and between 27 and 33 per cent. of them experienced some form of a problem. All 11 of the voters who were required to vote a challenged paper ballot were black. Between 170 and 184 white voters cast ballots, but very few of them

-16-

experienced voting problems. Most of the problems experienced by black voters could have been handled if the poll workers had scrupulously adhered to the procedures laid out during their training. It is true that the challenged votes would have made no difference in the outcome of any election, but this is beside the point. Each individual voter has a right to cast his ballot in accordance with State law, and this right is not to be denied, abridged, or encroached upon for reasons of race. Subtle means of discrimination, as well as blatant ones, are outlawed. "Manipulative devices and practices [may not be] . . . employed to deny the vote to blacks." Rice v. Cayetano, 120 S. Ct. 1044, 1054 (2000).

Instances in which favorable treatment was given to white voters are significant. We note in particular the fact that William and Deborah Sue Dixon, who lived a half mile outside the City, were permitted to vote a City ballot on the voting machine at the City polling place, without challenge. Their names were listed in the City register, but the address given was 528 Joyner Road. Tr. 192, 219. The tape that was made of occurrences at the polling place on election day reveals that Mr. Dixon told Ms. Freeman that he lived on Joyner Road "over by the high school." Tr. 344-46. Mr. Howe stated, in describing Mr. Dixon's explanation of where he lived, "across the railroad tracks." Tr. 347. On the tape, a male voice, which the District Court did not doubt was that of Mr. Howe, responded "across the railroad tracks" during this conversation. Tr. 800-01. Ms. Freeman admitted that on election day she knew there was no street within the town of Crawfordsville named Joyner Road, and also knew that the high school was a half mile outside the City limits. Mr. Howe, who had been Mayor of the City for 16 years and had lived there for 60, testified that he did not know at the time whether a street in Crawfordsville was named Joyner Road. We are driven to the conclusion that Mr. Howe's testimony about the Dixons is simply incredible, and that they were given favorable treatment because they were white, and, probably, because Mr. Howe and Ms. Freeman believed that they would vote for white candidates. No similar indulgence was granted to any black person.

-17-

We return to the specifics of Mr. Gollin's case. He testified that he had known Mr. Howe for 31 years at the time of the election. Mr. Howe had cashed checks for him at his store. Tr. 114. Mr. Howe has been to his house. Tr. 128. This testimony is clear and consistent. The contrary evidence, such as it is, of the defendants Howe and Freeman is unworthy of belief. Whether someone has "water" is not relevant to his eligibility to vote, which turns solely on whether he was registered and where he lived. The argument that Mr. Gollin's name was misspelled in the voter register, with a single incorrect letter, is, in our view, a flimsy pretext. We hold that the finding that Mr. Howe and Ms. Freeman did not racially discriminate in denying the vote to Mr. Gollin is clearly erroneous. There is not sufficient evidence in this record to make a similar conclusion with respect to the defendants Carlson and Rogers.

## 2. Derrick Marshall

Derrick Marshall was unquestionably a registered voter and a resident of Crawfordsville. His name was listed in the city precinct register. However, the word "absentee" had been stamped by his name. Both Ms. Freeman and Ms. James informed Mr. Marshall that he had already voted by absentee ballot, and would not be allowed to vote again. Tr. 238, 243. Mr. Marshall denied that he had voted. Tr. 239. No phone call was made by poll workers to the County Clerk's Office to determine if a mistake had been made when the register was stamped. Tr. 173, 597. Ms. Carlson testified: "He really insisted that he had not voted. But we couldn't – with an absentee marked we couldn't – he had already voted as far as we were concerned. It was on the book." Tr. 728-29.

The fact that the word "absentee" was stamped beside Mr. Marshall's name was certainly sufficient to raise a question in the minds of the poll workers. It was not, however, conclusive as to whether or not he had already voted. According to the County Clerk, when someone writes in and requests an absentee ballot, the ballot is mailed to the voter, and the word "absentee" is then stamped next to the voter's name

-18-

in the precinct binder. The stamping occurs at the time of mailing, not when the ballot is returned to the Clerk's Office. Tr. 576-77. Some ballots that are mailed out to people requesting them are not returned. A voter who requests an absentee ballot, but does not use it, is presumably entitled to vote in person on election day. This could have been the case with Mr. Marshall. Moreover, there are things that the poll workers could have done to investigate further. They could have telephoned the County Clerk's Office to try to determine whether an absentee ballot had been returned by the person in question, and apparently no such call was made. In addition, Mr. Marshall himself could have taken the initiative to go to the County Clerk's Office and request an investigation. When this happens, the County Clerk will do research, and, if it's justified, send the voter back to the polling place with a slip instructing the poll workers to allow him to vote. This also was not done in the instant case.

The District Court found that the defendants' actions towards Mr. Marshall were not motivated by race. The evidence is fairly even. On the whole, we are not persuaded that this finding was clearly erroneous. The stamping of the word "absentee" on the voting register raised a concrete and serious problem. Decisions in polling places on election day are made rather quickly. There is often not enough time to investigate thoroughly each individual case. Our judgment is further influenced by the fact that Carla James, the black poll worker, took the same position with respect to Mr. Marshall that the defendants Howe and Freeman took. We will affirm the District Court's decision with respect to the plaintiff Derrick Marshall.

### 3. Kimberly Nathan Warren

Kimberly Nathan Warren is a registered voter, and she lived in Crawfordsville, Arkansas, at the time of the election. She had lived at her family home in Crawfordsville since 1988, with the exception of three months in 1996 (ending in September) when she lived outside the City limits in the McNeil Apartments. Ms. Freeman and Ms. Warren had known each other for years. Ms. Warren's father had

-19-

worked for the City, and Ms. Warren paid the water bill in her father's name at the Water Department where Ms. Freeman works.

When Ms. Warren went to the City polling place to vote on election day, Ms. Freeman told Ms. Warren that she did not live in Crawfordsville. Ms. Warren insisted that she did. Her name had been listed in the County register under her maiden name, "Nathan," apparently reflecting the short time when she lived outside the City.

We are firmly convinced that the defense position with respect to this plaintiff is not plausible. Ms. Freeman had known Ms. Warren for years. It is true that her name was not in the City register, but that was not a sufficient reason for the treatment that Ms. Warren received. Under the instructions that had been given to the poll workers, Ms. Warren should not have been turned away. No election worker called the Clerk's Office, and no one told Ms. Warren that she could fill out an address-change form and vote. No one offered to allow her to vote a challenged ballot on paper. No one even informed her that she ought to go across the street and cast her vote in the County polling place. As a consequence, she was altogether denied the right to vote. We believe that the finding in favor of Ms. Freeman with respect to Ms. Warren's claim is clearly erroneous. There is no substantial evidence that any of the other defendants played a part in Ms. Warren's difficulties.

### B. Plaintiffs Whose Votes Were Challenged

In general, the following procedure was followed with respect to persons whose votes were challenged, but were still allowed to vote. If someone came into the polling place and was challenged, either by a poll watcher (Mr. Rogers) or a poll worker, that person would not be allowed to vote on the machine. Instead, he or she would be given a paper ballot. In this way, the challenged ballots (and, as we have noted, there were 11 of them in all) could be separated, and each ballot could be identified, if necessary, in the event of an election contest.

### 1. Sharon White

Sharon White lived with her grandmother, Rae Miller White, on Main Street in Crawfordsville. She has a "general delivery" post office address, and was listed on the County register. On November 5, 1996, Ms. White went to the County polling place, but an election worker there, who knew that Ms. White lived in the City, told her to go across the street and vote at the City polling place, in the Water Department office.

When Ms. White got to the City polling place, her name could not be found on the City register. However, Ms. James, the black poll worker, told Ms. Freeman that Ms. White was indeed a City resident. Ms. White was well known to Ms. Freeman, having paid her grandmother's water bill every month at the Water Department office for at least seven years. Tr. 55. In addition, she had known Mr. Howe since she was six years old, having shopped in his store, sometimes every day. Tr. 54. When Ms. White approached the voting table, Ms. Freeman informed her that her name was not on the City voting register, and that she could not vote, because she did not pay a water bill in her own name. Tr. 56-57, 70. No one called the Clerk's Office. Tr. 60, 163, 527-28. Johnny Rogers, the poll watcher, challenged Ms. White's vote, because her name did not appear on the City register, Tr. 671, but most of the challenge form was filled out by someone else. The challenge form stated: "Does not appear in the City box, but all say she does." Tr. 754. According to Ms. Carlson, "everyone in the polling place, all the officials said that she did live in the City." Tr. 755. Ms. White was given a paper ballot in order to vote in accordance with the procedure described above. When Ms. White voted, two unnamed white men stood over her and watched her, Tr. 59, with Mr. Howe standing "about two or three feet behind them." Tr. 71, 78.

The defendants introduced very little specific evidence about this incident. Ms. Freeman testified that she did not remember Ms. White's coming into the polling place. The District Court found that Ms. White was "not denied her franchise." In a way, this is true, because Ms. White was allowed to cast a challenged paper ballot. On the other

hand, her vote was never counted (more about this later), and she was subjected to harassment, with the apparent cooperation of Mr. Howe. We believe that the evidence is overwhelming that both Ms. Freeman and Mr. Howe knew Ms. White, and the fact that Ms. White had been paying her grandmother's water bill, instead of a bill in her own name, had nothing to do with her right to vote. The regular procedure which had been given to the poll workers at training was not followed in this case. The County Clerk's Office was not called, nor was Ms. White given a chance to use a change-of-address form. We hold that the District Court's finding in favor of Ms. Freeman and Mr. Howe is clearly erroneous. With respect to the defendants Carlson and Rogers, however, we affirm. Neither of them lived in the City. In fact, Mr. Rogers did not even live in Crittenden County. He was representing the best interests of his congressional candidate, and his challenge of a ballot being cast by a person whose name was not on the City register is understandable. He could not be expected to be familiar with individual citizens and where they lived.

## 2. Arnissa[1] Edwards

Arnissa Edwards is a resident of Crawfordsville. She lived in the "white section." Her name was listed in the City register. When she came into the polling place, Ms. Edwards signed the register and said she had brought Latesa Calloway[2] to assist her in voting. Ms. Edwards said she needed help because she did not know how to use the voting machine, and that she had been allowed assistance with the machine in previous elections. Mr. Rogers, the poll watcher, challenged Ms. Edwards's vote because of "[i]mproper voting procedures. She did not state reason for help with her

---

[1]Ms. Edwards's name is spelled differently in the record, sometimes Arnissa, sometimes Arnnisa.

[2]Latesa Calloway is a named plaintiff, but appellants have abandoned any claim for damages on her behalf. Brief for Appellants 4 n.6. Accordingly, the finding of the District Court with respect to her claim will be affirmed.

vote." Tr. 669. Ms. Calloway then asked whether Ms. Edwards could vote by paper ballot, and this is what occurred.

We find this plaintiff's situation somewhat difficult. On the one hand, it seems clear that she was not in fact entitled to assistance in voting. She conceded at trial that she had no disability. Tr. 508. Mr. Rogers's statement that "[s]he did not state reason for help with her vote" is correct, if "reason" is understood as "good reason." On the other hand, the fact that Ms. Edwards was not entitled to have someone help her vote did not require that the vote itself be challenged. The logical outcome would have been to allow her to vote on the machine, but without assistance. Instead, she was required to vote by paper ballot. This procedure seems to have been suggested by Ms. Calloway herself, however. There is no substantial evidence about the conduct of the defendants Freeman, Howe, and Carlson during this incident. Ms. Edwards testified that on several occasions Ms. Freeman had asked her whether she was planning to sell her house, and this is evidence of racial animus if believed. Although what happened to Ms. Edwards makes us somewhat uneasy, we have no definite and firm conviction that the District Court's finding adverse to her claim was clearly erroneous. According, the finding will be affirmed.

### 3. Stanley Calloway

Stanley Calloway was a convicted felon. His name was on the City register, and he signed in, but Ms. Carlson then challenged him on the basis of his conviction. Under Arkansas law, convicted felons cannot vote. If there was any racial prejudice operating with respect to Mr. Calloway, it could not have been the cause of his vote's being disallowed. He was not entitled to vote in any event. The finding of the District Court adverse to Mr. Calloway's claim will be affirmed.

## C.  Plaintiffs Allegedly Denied Assistance of Their Choice

It is important to remember, in evaluating these claims, what the law and accepted practice were with respect to voters who asked for help.  Any voter with a disability was entitled to assistance from any person of his or her choice.  It did not matter who the person was.  A relative, a friend, even a candidate, was eligible to give assistance.  If a voter asked a poll worker to help, two election judges (not just one poll worker) would give assistance.

### 1.  Ruby Coburn

Ruby Coburn was a qualified voter in the City.  She requested help in voting on the ground of inability to read well and "nerves."  Tr. 418, 429.  Ms. Coburn asked LaSaundra Johnson for help.  Tr. 463.  Both Ms. Coburn and Ms. Johnson testified that Mr. Howe gave Ms. Johnson a sheet of paper with an "amendment" on it, and told her that she had to read that paper before she could help Ms. Coburn in voting.  Ms. Johnson refused to read the paper, became upset, and left.  Ms. Coburn was then offered assistance from one (apparently not two) poll workers, but she declined.  She voted on the machine without assistance.  However, because she could not read well, she voted only for about two candidates.

Mr. Howe testified that he never stopped Ms. Johnson from helping anyone, Tr. 789, nor did he make anyone read an amendment as a condition to assisting another person to vote, Tr. 790.  We are firmly convinced that Mr. Howe's testimony was unreliable.  He himself conceded that his memory was fading, and his testimony with respect to the Dixon incident, recounted above, was clearly incorrect, as the videotape showed.  Requiring Ms. Johnson to read an "amendment" (the reference may be to the title of one of the constitutional amendments on the ballot at the time) was improper.  It is of course true that Ms. Johnson would need to read in order to assist Ms. Coburn with a reading disability, but that was not the concern of the poll workers.  Ms. Coburn

had a right to ask anyone to help her, and how well that person could read was no one else's business. We hold that the finding against Ruby Coburn's claim is clearly erroneous, so far as the defendant Howe is concerned. The evidence with respect to the other defendants is either slight or nonexistent, and the judgment in their favor on Ms. Coburn's claim will be affirmed.

## 2. Willie Taylor

Willie Taylor is a registered voter and a resident of the City. He asked for help from LaSaundra Johnson (the same person involved in the Coburn incident, just recounted). Mr. Taylor had poor eyesight because of glaucoma. Ms. Freeman and Mr. Howe informed Mr. Taylor that Ms. Johnson could not help him, because she was not kin to him. Mr. Howe testified that he understood that a person needing assistance had to choose a relative or a good friend. Tr. 789. (There is no evidence as to why Mr. Howe would not believe that Ms. Johnson was a good friend of Mr. Taylor's.) Ms. Johnson was not allowed to help Mr. Taylor, and then, at Mr. Taylor's request, Mr. Howe helped him. Mr. Taylor could not see the buttons in the voting machine to punch. He had to tell Mr. Howe how he wanted to vote, and Mr. Howe then punched the buttons.

What happened to Mr. Taylor was improper and contrary to law. He had a right to LaSaundra Johnson's help. There is no requirement that she be a relative or a good friend. Violations of state law and election practice, of course, are not, in and of themselves, the same thing as racial discrimination. However, when the alleged violators' conduct is otherwise questionable, and when no plausible justification is asserted, the inference of discriminatory intent is strong in the circumstances of this particular election. We hold that the District Court's finding on Mr. Taylor's claim, so far as the defendants Freeman and Howe are concerned, was clearly erroneous. There is no evidence that the defendants Carlson and Rogers were involved in this incident, and the finding in their favor will therefore be affirmed.

## D.  Voters Who Were Allegedly Harassed

### 1.  Nikita Calloway

Nikita Ladell Calloway, who was 20 years old at the time of the election, had lived in Crawfordsville all his life.  He was frequently in the Water Department to pay bills, and Ms. Freeman had seen him there from the time he was a child until three months before the election.  He saw Ms. Freeman at the Water Department about eight times in the year before the election.  He would stop and talk with her, and she would call him by name, either "Nikita," or his nickname, "Bird."  Tr. 37, 47, 51-52.  Mr. Calloway had also done yard work for Ms. Freeman when he was about 15 years old. Tr. 38.

On November 5, 1996, when Ms. Freeman asked Mr. Calloway his name, he replied "Nikita Calloway."  Ms. Freeman then said, according to Mr. Calloway's testimony, "You can't vote, because you are trying to vote in place of a girl."  Ms. Freeman said, "That can't be your name.  That's a girl's name."  Tr. 153 (testimony of Carla James).  Finally, Mr. Calloway pulled out an identification card and showed it to Ms. Freeman.  Tr. 39-40.  At that point, someone whose voice he didn't recognize stated that such a form of identification could be made up on computers.  Tr. 41.  Then, "[a]fter a little conflict," he was allowed to vote on the voting machine.  Tr. 50.  Mr. Calloway testified that while he was voting, Mr. Howe "stuck his head in" the voting booth for about 15 seconds.  Tr. 42-43.  Mr. Howe denied the incident.  Tr. 790. About 30 people were in the polling place when these events occurred, and Mr. Calloway felt "ashamed" and "embarrassed."  Tr. 44.

Mr. Calloway was allowed to vote.  What happened to him was not so serious as denying a person the right to vote, but being harassed during the exercise of one's franchise is still unlawful if the harassers are acting under color of state law and are motivated by racial prejudice.  The District Court rejected this claim, finding Ms.

Freeman's testimony more credible. Among other things, the Court said that "Calloway was the only one of these persons [Calloway, Howe, Freeman, and Carlson] to testify" to the plaintiff's version of events. This is true, but it overlooks the fact that Carla James, not a party to the case, backed Mr. Calloway's account. Ms. James testified that Ms. Freeman said to Mr. Calloway, "That can't be your name. That's a girl's name." Tr. 153. In our view, the finding of the District Court on this point is clearly erroneous. No one denied the length of Mr. Calloway's residence in Crawfordsville, the fact of his having frequented the water office, or his having done yard work for Ms. Freeman. Nikita is not a "girl's name," not exclusively, anyway, and it wouldn't matter for present purposes if it were. There is no evidence that any white voter was similarly impeded. We hold that Ms. Freeman and Mr. Howe are liable in this incident. There is no evidence connecting Ms. Carlson with these events.

## 2. Grace Page

There is little evidence in the record about Ms. Page. Her claim is that she was improperly ignored when she attempted to vouch for James and Levetter Williams, black voters whose residence had been drawn in question. Ms. Page herself did not testify. The District Court's finding rejecting her claim is not clearly erroneous.

## E. Black Candidates

## 1. Mary Holmes

Appellants have abandoned any claim for damages on behalf of Mary Holmes, see Brief for Appellants 4 n.6, so the finding adverse to her claim will be affirmed.

## 2.  Loretta Page

Loretta Page was a candidate for Alderman in the 1996 election.  She came into the polling place several times, to assist two voters who had asked her help, and to check on the number of votes.  Tr. 315-16, 202.  Late in the afternoon, Dixie Carlson told her that she could not come into the polling place again.  Tr. 316-17.  There was evidence that a white candidate, J.B. Cole, had been in the polling place continuously on one occasion for 20 or 25 minutes without hindrance.  Ms. Freeman and Ms. Carlson told Ms. Page that she could stick her head in to check the vote, but then had to leave, and had to remain more than 100 feet from the polling place.  Tr. 169.  There was evidence that Mr. Cole was passing out leaflets at the front door of the polling place, within the 100-foot zone, on at least one occasion.  Tr. 248, 300.

Arkansas law prohibits "electioneering" within 100 feet of a polling place.  Ms. Page was allowed to enter the polling place to help other voters who specifically requested her assistance, and also, from time to time, to check on the number of votes.  Apparently Ms. Freeman and Ms. Carlson considered the mere presence of a candidate within the polling place, for no particular purpose, to be "electioneering."  We think this understanding, though arguably erroneous, was reasonable.  Crawfordsville is a small town.  Many voters would know Ms. Page, and might be intimidated or made to feel awkward by her presence in the polling place.  The District Court's finding that no racial discrimination occurred with respect to Ms. Page is not clearly erroneous.

## 3.  Bernice Bates

Bernice Bates was a candidate.  Tr. 446.  She had served as an Alderman from 1991 to 1995.  She helped five or ten people to vote, at their request, Tr. 461.  According to Ms. Bates's testimony, she came in to help a voter and was asked to leave by Ms. Carlson, who took the position that Ms. Bates's mere presence in the polling

-28-

place was "electioneering." Tr. 169. There is a conflict in the evidence about whether Ms. Carlson "grabbed" Ms. Bates's arm, or merely touched her, Tr. 169, 743.

This claim seems somewhat stronger to us than that of Loretta Page, which we have just discussed. Ms. Bates had a specific right to be in the polling place for the purpose of helping any voter who had requested her assistance by name. Ms. Carlson's understanding that Ms. Bates was "electioneering" was incorrect. On the other hand, Ms. Bates was allowed to assist five or ten other voters, and Ms. Carlson testified that she did not intend to intimidate or harass Ms. Bates. Tr. 743. According to Ms. James, Ms. Bates created a disturbance after this incident occurred, and the police were called. Tr. 205. Although we have some doubts about the matter, we are not firmly convinced that the finding of the District Court was erroneous, and its finding with respect to this claim will therefore be affirmed.

### 4. Alice Calloway

Alice Faye Calloway was a candidate for City Recorder. Ms. Calloway's case is somewhat similar to that of Bernice Bates. She periodically entered the polling place, asked for a count, and then left. Tr. 201. She entered the polling place at least four times during the day. On one of these occasions, she was attempting to help her mother, Annie Mae Nathan, to vote. Ms. Carlson approached her and told her that she could not be in the polling place. Tr. 247. Ms. Calloway informed Ms. Carlson that she was helping her mother to vote at her mother's specific request. According to Ms. Calloway, Ms. Carlson put out both of her hands to prevent Ms. Calloway from walking past her and stated, "I told you not to come in here." Tr. 248. Ms. Calloway then left, and Ms. Nathan voted without her assistance. Tr. 735. Ms. Carlson denied pushing Ms. Calloway. Tr. 743.

Again, we consider this claim somewhat stronger than that of Loretta Page, and perhaps than that of Bernice Bates, since it was Ms. Calloway's own mother whom she

was attempting to assist. There is no question that Ms. Nathan had the right to request assistance from her daughter. The fact that her daughter was a candidate, and had already been in the polling place several times, complicates the situation. On the whole, we do not have a definite and firm conviction that the District Court's finding was mistaken. Although this is a close case, we affirm with respect to Ms. Calloway's claim.

### F. Events Involving Black Poll Watchers

### 1. Latesa Calloway

As we have already noted, Latesa Calloway's claim for damages has been abandoned.

### 2. LaSaundra Johnson

LaSaundra Michelle Johnson was a black poll watcher for Bernice Bates, but was not allowed to act as such because her credentials were not proper. No question is raised about this particular decision by the election officials. However, Ms. Johnson was also involved in incidents respecting Ruby Coburn's and Willie Taylor's request for assistance – incidents we have already described in connection with our discussion of these plaintiffs' claims. When Ms. Johnson attempted to help these voters, Mr. Howe said she had to read out loud to him "some kind of amendment." Tr. 464. The "amendment" had been handed to Mr. Howe by Ms. Freeman. Ms. Johnson refused to read the required material, and then left. Mr. Howe also told her that she could not assist Mr. Taylor because she was not related to him. Tr. 464.

For reasons already given in our discussion of the Coburn and Taylor claims, we believe the finding in favor of the defendants Howe and Freeman on Ms. Johnson's claim was clearly erroneous.

### III. Other Claims for Relief

In addition to the individual plaintiffs' claims for damages against pollworkers and Mr. Rogers, the poll watcher, in their individual capacities, plaintiffs also request an award of damages against the three poll workers in their official capacities. We have held that the District Court's findings in favor of the defendant Dixie Carlson are not clearly erroneous, so there is no need to discuss an official-capacity claim with respect to her. Mr. Rogers, the poll watcher, has no official capacity. The official-capacity claims against Ms. Freeman and Mr. Howe are the equivalent of claims against the County (assuming for present purposes as plaintiffs contend, that poll workers are county employees). We believe the District Court properly rejected these claims. The actions of Mr. Howe and Ms. Freeman which we have held to be discriminatory were purely individual actions. There is no evidence that they reflected or were influenced by any policy of Crittenden County. The County cannot be liable in the absence of some custom or prevailing practice that violates the law. Accordingly, the District Court's decision to reject any official-capacity liability on the part of the poll workers will be affirmed.

A claim for damages is made against Ruth Trent, the County Clerk, in her official capacity only. She is clearly a county employee. The District Court found that Ms. Trent was not guilty of any intentional discrimination, and this finding is not clearly erroneous. Ms. Trent made diligent efforts, both before and after the election, to ensure that the voter lists were accurate. In doing so, she consulted both white and black voters. There is no substantial evidence of discrimination on her part.

Damages are sought against the three members of the County Board of Election Commissioners, Messrs. Dawson, Fairley, and Graham, in their individual and official capacities. We believe the District Court correctly rejected these claims. The Election Commissioners carried out their duties in good faith. Mr. Fairley testified that state law prohibited the Election Commission from counting the challenged votes, given that they

would not affect the outcome. This was a mistake of law. In fact, state law gave the Election Commission discretion whether to count these votes or not. This error, though, was simply that. It does not show racial discrimination on Mr. Fairley's part. We do not believe that there is any substantial evidence of any racial discrimination by any of the three members of the County Board of Election Commissioners. Accordingly, the District Court's finding in their favor will be affirmed.

Plaintiffs also request certain sorts of equitable relief, mainly having to do with the future conduct of elections in Crittenden County. We do not believe that any such relief is necessary. The County has made, and, we believe, will continue to make, diligent efforts to maintain accurate voter lists and to comply with the law. Individual discriminatory acts on the part of two poll workers at a single election do not, in our view, justify equitable relief. Plaintiffs ask that we disqualify Mr. Howe and Ms. Freeman from acting as poll workers in the future. We decline to do so. We believe an award of damages against them is sufficient relief, and they should not be required to forfeit future eligibility for poll-worker positions.

## IV. Conclusion

To summarize: the judgment of the District Court is affirmed, with the following exceptions. As to plaintiffs William Gollin, Kimberly Nathan Warren, Sharon White, Ruby Coburn, Willie Taylor, Nikita Calloway, and LaSaundra Johnson, the judgment is reversed, and the cause remanded for the assessment of damages. As to Ms. Warren, liability is found only against Ms. Freeman. As to Ms. Coburn, liability is found only as to Mr. Howe. As to the other prevailing plaintiffs, Mr. Howe and Ms. Freeman will be jointly and severally liable. It will be for the District Court, in the first instance, to fix the appropriate amount of damages. At least nominal damages must be awarded. In addition, persons whose right to vote was denied altogether should be entitled to more than nominal damages. Moreover, humiliation, embarrassment, and mental anguish are compensable. See Carey v. Piphus, 435 U.S. 247, 264-65 n.22 (1978);

Wayne v. Venable, 260 Fed. 64 (8th Cir. 1919). See also Ashby v. White, 1 Bro. P. C. 62, 1 Eng. Rep. 417 (H. L. 1703), cited by the Supreme Court in Carey, apparently with approval. Punitive damages may also be considered. The violations of law were intentional. Qualified immunity will not be a defense. The right to be free from racial discrimination in matters of voting has long been clearly established.

Although we have differed from the District Court in some respects, we wish to quote, with approval, a portion of that Court's opinion:

> [T]he Court feels compelled to make a few observations about the atmosphere for African American voters in Crawfordsville. . . . the Court was impressed with the sincerity of the plaintiffs in their perception of their treatment at the polls and the chilling effect it will have on participation in future elections. The Court cannot ignore the long history of racial strife in this small community and the effect it has had on the election process. The Court firmly believes that better relations between the races is not only possible, but essential to the efficient functioning of city government in Crawfordsville. For that reason, the Court believes that a more heightened sensitivity to the rights and needs of African Americans should be emphasized during the training of polling officials and poll workers with a goal of cooperation rather than contentiousness.

The judgment is affirmed in part and reversed in part, and the cause remanded for further proceedings not inconsistent with this opinion.

It is so ordered.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.